[No. 37099.     Department Two.     December 24, 1964.]

PACIFIC DREDGING COMPANY, INC., *Respondent,* v. JAMES
HURLEY *et al., Appellants.** 

*Reported in 397 P. (2d) 819.

*Lycette, Diamond & Sylvester* and *George W. Wilkins,* for appellants.

*Soriano & Soriano,* for respondent.

DONWORTH, J.—This is an appeal from a judgment granting to respondent $26,546.44 in damages on its claim for negligence of appellants, insurance brokers, in failing to extend or renew marine insurance coverage on respondent's dredge, which sank in Puget Sound.

Respondent, Pacific Dredging Company, Inc., was the owner of a suction dredge, called "Pacific Dredge No. 1." The dredge was used principally on inland waters around Seattle (Lake Washington, Lake Union, the ship canal, and

Duwamish River). Appellants, since 1959, had acted as exclusive insurance brokers for respondent and handled all matters relating to marine insurance covering respondent's dredges.

Respondent, in 1961, carried a standard marine hull insurance policy on the dredge with the Glens Falls Insurance Company (herein called the insurer). The Marine Office of America was the managing underwriter for the insurance company on this coverage. The policy was obtained for respondent by appellants acting as insurance brokers. The policy was an *enumerated perils* policy which insured the dredge against

". . . Perils . . . of the Seas . . . and . . . all other like Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment or Damage of the said Vessel, &c., or any part thereof."

It further provided that the dredge was insured for and valued at $33,000.

The policy also contained a trading limits warranty which reads as follows:

"Warranted during the currency of this policy to be employed in the Assured's dredging business, and confined to the waters of Lake Washington, Lake Union and waters immediately adjacent thereto, but not West of the Government Locks, however, with permission to move to and operate on the waters of the Duwamish Waterway."

Sometime in early 1961, respondent had undertaken to do some dredging at Day Island Yacht Basin near Tacoma. Respondent, through appellants, obtained an endorsement for its insurance policy on the dredge extending the trading limits to include one voyage to Day Island and return. This endorsement gave the extended coverage from July 14, 1961, until September 14, 1961. The dredge sank while at the job, and was returned to the Duwamish shipyards in Seattle, where it was repaired. The repairs were paid for by the insurance company. The dredge was under repair from sometime in August until October 16, 1961.

In the last week of September, Joseph A. Park, respondent's president, was on the dredge at Duwamish yard, where

he met James Atkins, one of the partners in appellants' firm. They discussed the further extension of the trading limits specified in the policy so that the dredge could return to Day Island to finish the job. Mr. Park stated that the dredge would soon be ready to leave Seattle, and, according to his testimony, he was assured by Mr. Atkins that the dredge would be "covered for the trip."

Thereafter, appellant Atkins obtained from the insurer an extension of the trading limits and mailed the endorsement and an invoice to respondent. Respondent received the endorsement and invoice, but read only the invoice. The invoice stated: "Trading Warranty extended to include one voyage to Day Island Yacht Club, Tacoma," "Begins 10-2-61" and "Expires 2-24-62" for a premium of $33.70. The endorsement referred to reads as follows:

"Effective October 2nd, 1961, and in consideration of an additional premium in the amount of $33.70, it is mutually understood and agreed that the trading warranty under this policy is extended to include one voyage to Day Island Yacht Club, Tacoma, and while employed there and return to the basic trading limits, described elsewhere herein, but not beyond November 2nd, 1961, N.P.S.T."

Mr. Park testified that, on October 31, 1961, he went to the office of appellants for the purpose of discussing insurance coverage then in effect on some tools and equipment on the dredge, which items were covered under a policy issued by another insurance company which did not carry the hull insurance on the dredge. At that time, Mr. Park disclosed to Mr. Atkins that the dredge had completed its work at Day Island but that it was still there because of the bad weather, and that he intended to keep it there until the weather improved sufficiently to bring the dredge back to Seattle. According to Mr. Park, Mr. Atkins agreed that this was a good idea.

November 6, 1961, the dredge was made ready for the return voyage to Seattle by Mr. Ferguson, the skipper of the dredge, an employee of respondent. He then turned the dredge over to Foss Launch and Tug Company's tug, the "Drew Foss," which took the dredge in tow and towed

it up the Sound toward Seattle. About one mile south of Alki Point, the dredge sank in about 550 feet of water.

The evidence indicates that the weather was fair and calm, with a slight northerly breeze blowing. There is no testimony from anyone who may have been aboard the dredge during the tow, nor is there any testimony from anyone aboard the tug "Drew Foss" concerning the actual cause of the sinking or the manner in which the sinking had occurred. The only testimony concerning the cause of the sinking was directed toward the seaworthiness of the dredge and toward the possibility that the manner of tow or speed of tow was to blame for the sinking. The testimony regarding the possibility that the manner or speed of the tow may have caused the sinking was from the skipper of the dredge, who was not aboard the dredge or the tug when the dredge sank. This was elicited on cross-examination, whereupon respondent's counsel immediately interposed his remark that any testimony as to the cause of the sinking was pure speculation.

January 17, 1962, the insurer, through its managing underwriter, denied the claim of respondent[1] for loss of the dredge under the policy on two grounds, (1) that the claim did not show that the loss occurred due to an insured peril, and (2) that the dredge was outside the trading limits warranty, because the endorsement extending the scope of the trading limits had expired on November 2, 1961, whereas the loss occurred on November 6, 1961.

March 19, 1962, respondent sued Foss Launch & Tug Company, Inc., in the United States District Court, for the loss of the dredge, alleging $83,000 damages caused by (1) breach of contract, and (2) negligence in the towing of the dredge. The tug company denied liability, and alleged some affirmative defenses. This suit was compromised and settled in November, 1962, for a total payment of $6,453.56, and the release of Foss Launch & Tug Company, Inc., and all its

[1] In respondent's claim, the cause of loss was stated as follows:
"Dredge was in tow of tug 'Drew Foss' and without previous warning it sank. There was no showing that the dredge struck an obstruction."

employees or agents from all liability for the loss of the dredge. Neither appellants nor the insurer had any knowledge of the institution of this action against the tug company until after it was settled and dismissed.

Meanwhile, early in February, 1962, respondent had instituted the present action against appellants, alleging their negligence in failing to obtain an extension of the trading limits which would be effective until the dredge had returned to Seattle from Day Island, and that the insurance company had denied coverage under the policy due to this failure to obtain the extension of trading limits for a sufficient time. Appellants denied liability and set up several affirmative defenses. The case was tried before a jury. The verdict was in favor of respondent in the amount of $26,-546.44, being the value of the dredge as stated in the insurance policy, less $6,453.56, the amount obtained by respondent from Foss Launch & Tug Company, Inc., in the settlement of the case above referred to.

The trial court denied motions to dismiss the action made by appellants during the trial and also their motions for judgment n.o.v. and for new trial. Judgment was entered on the verdict. Appellants then took this appeal.

Appellants have assigned 11 errors to the trial court's rulings. These 11 assignments raise 4 specific questions. First, assuming that appellants were negligent in failing to obtain or renew an extension of the trading limits warranty endorsement for a sufficient length of time to cover the dredge's return to Seattle, is the burden upon respondent to show that the loss was caused by one of the perils insured against in the basic marine insurance policy if the requested extension of time had been obtained? Second, did the respondent submit sufficient evidence as to the cause of the sinking to warrant submitting to the jury the question of whether or not the cause of the sinking would have been covered under the enumerated perils clause in the policy? Third, was the release by the insured of a possible tortfeasor, who may have been responsible for the sinking of the vessel, in effect, a release of subrogation rights so that

the insurer would not be liable and hence the insurance broker would be discharged from liability? Inherent in the third question is the fourth question—did subrogation rights against the towing company exist in the insurer at the time the release was given to the tug company by respondent?

■ The first question is relatively easy to answer. The question really asks whether respondent, insured, must prove that, if the insurance broker had obtained the insurance requested, the loss would have been within the risks insured against in the policy. In ordinary negligence terminology, the question is—must the insured prove a causal connection between the negligence of the insurance broker and the damage to the insured? The answer, of course, is yes.

There is a dearth of case authority on this point. The case most nearly in point is *Glatter v. Schwartz*, 194 N.Y.S. 22 (Sup. App. T., 1922). This is not a marine insurance case, but the principle is the same in all types of insurance. The latest marine insurance case clearly applicable is *Webster v. DeTastet* (1797), 7 T. R. 157. However, the text authorities all support our affirmative answer with clear statements of the problem and the principles. See 3 Couch on Insurance (2d ed.) § 25:59; 1 Arnould, Marine Insurance (14th ed., Chorley) § 161, p. 176; Eldredge, Marine Policies (3d ed., Atkins, 1938) 215; McNeil, Liability of Insurance Agents, in Roady and Andersen, Professional Negligence, 298, 306 (1960).

The general rule is recognized as being applicable to both breach of contract and negligence actions against an insurance broker because the issue is one of *actual causation* of damage to the insured. The "but for" test has been used to resolve the issue. See McNeil, Liability of Insurance Agents, in Roady and Andersen, op. cit., *supra.*

■ Undoubtedly, both the trial court and respondent agree with appellants' position that causation in fact must be established in this negligence action, as in any other negligence action. The only difference between them is what must be shown to complete the chain of causation.

The trial court gave instructions that the negligence of the defendant must be the "proximate cause" of the damage to the plaintiff. But the effect of the trial court's instructions was to lead the jury to believe that the chain of causation was complete if the insured proved that the negligence of the insurance broker had caused the lapse of the endorsement extending the trading limits warranty. The instructions failed to instruct the jury that the respondent must prove that the damage to the item insured was caused by a risk insured against by the policy that would have been in effect except for the negligence of the broker.

The trial court gave the whole policy to the jury without instructions as to its significance in this case, or to what use the jury was to put the policy. If there were a jury question on whether or not this loss would have been covered by the coverage clause of the policy, then the court must give appropriate instructions explaining to the jury any terms of the coverage clause that the jury might not be expected to understand, such as what factual patterns are or are not included within the coverage, when such matters are brought to the attention of the trial court, as was done in this case.

Respondent contends that the jury was properly instructed because the burden of proving that the insurance company would have had a defense under the policy is on the insurance broker, and that this was covered by the instructions. The instruction relied on by the respondent is misleading in the context in which it was given. The wording was correct, so far as it went, but the instruction fails to distinguish between what the insured must prove in order to show a claim under the coverage clause of an insurance policy and what the insurance company must prove in defense against a claim.

The rule announced by the court pertains only to defense. Yet the court gave this instruction in such a context that the jury was lead to believe that the insurance company (and the insurance broker in the position of the insurer) must disprove the allegations of the insured even though the insured has introduced no evidence to support his

alleged claim. There is a basic distinction between the insured's responsibility to show that a loss was caused by a peril insured against in a policy and the insurance company's responsibility to prove certain defenses with regard to a claim, such as a breach of warranty, or lapse of the policy, or a release of subrogated rights. See 21 Appleman, Insurance Law and Practice, 20-23, 177-180 (1962).

It is clear to us that the jury was not instructed so that it could or did understand that, in order to find the existence of a causal connection between the negligence of the insurance broker and the uninsured loss of the dredge, it must first find that the coverage clause of the requested insurance policy would have insured respondent against perils, one or more of which actually caused the sinking of the dredge. The trial court erred in this regard, as claimed by appellants in their assignments of error, and this error was prejudicial.

We desire the precise limits of our holding on this point be understood and, hence, elaborate on the subject as follows: If the trial court had clearly ruled that the insurance policy coverage clause insured against the cause of the sinking of this dredge, as a matter of law, then the court's instructions would have been correct (although we hasten to add that we would then have had to review this ruling of the trial court in the light of the evidence in the case). Furthermore, even if the trial court had not ruled on this point, and if the question of whether the policy coverage clause insured against such a loss had not been discussed, the pleading in the complaint was sufficiently broad[2] so

---

[2]Respondent's complaint alleged as follows:

"That the insurance coverage provided by the Glens Falls Insurance Company was for the sum of Thirty-three Thousand Dollars ($33,000) upon the hull of said dredge; that claim has been presented to the Glens Falls Insurance Company; that they have denied the claim and advise that they had limited the extension of trading limits by endorsement to the 2nd day of November, 1961; that the said loss occurred on the 6th day of November, 1961, and therefore was not covered by the said

that, in spite of the denial in appellants' answer,[3] we would be inclined to treat the question of causation more narrowly, provided the policy had been an "all risk" policy, or if the cause of the loss were clearly within the perils insured against. That treatment would be in accord with the realistic approach used by this court and by other courts of last resort in connection with suits against insurance brokers for breach of contract or negligence.[4] But those situations are distinguishable from this case because in such cases the cause of the loss was clearly shown to be one of the perils insured against, had an effective insurance policy been obtained.

We turn to the second question. Was the evidence which was introduced into the case sufficient to take to the jury the question of whether the sinking of the dredge was caused by a peril insured against by policy? If the answer to this question is no, the case must be dismissed. The answer to this question depends first on our interpretation of the clause in the policy defining the perils insured against.

The insuring clause in this marine hull policy was the ordinary enumerated perils clause[5] plus a standard "Inch-

policy of insurance. That by reason of the said denial of coverage, plaintiff has been damaged in the sum of Thirty-three Thousand Dollars ($33,000) or the value of the insurance coverage to them."

[3]"Answering paragraph VI, defendants deny each and every allegation contained therein."

[4]*Bates v. Bowles White & Co.*, 56 Wn. (2d) 374, 353 P. (2d) 663 (1960), is a good example of a situation where an all-risk policy was involved in a marine insurance case. In that case, the boat ran aground. There was no discussion of the cause of this mishap, and there was no need for one, for the obvious reason that the loss from any cause was insured, unless shown to be excluded by other language.

In the instance of a building destroyed by fire, when the agent is sued for his failure to provide fire insurance on the building, since such a loss is obviously within the peril insured against, unless expressly excluded, the burden of proving any loss outside the policy is obviously on the insurance agent. See *Stevens v. Wafer*, 14 S. W. (2d) 295 (Tex. Civ. App., 1929).

See *Hardt v. Brink*, 192 F. Supp. 879 (W.D. Wash. 1961) for another instance where the causal connection was assumed without discussion. This was a safe, appropriate, and just assumption in that case, because fire insurance would normally have been written to cover this risk.

[5]"Touching the Adventures and Perils which we, the said Assurers, are contented to bear and take upon us, they are of the Seas, Men-of-

maree" clause.[6] These clauses have been interpreted innumerable times. We shall briefly discuss them in two parts—(1) the enumerated perils clause, and (2) the "Inchmaree" clause, as it broadens perils insured against.

■ First, the portions of the enumerated perils clause which are claimed to be pertinent to this case insured respondent against ". . . Perils . . . of the Seas . . . and . . . all other like Perils, Losses and Misfortunes. . . ." The "perils of the seas" provision insures against wave action, wind action, and obstructions which are "fortuitous" as differentiated from ordinary or expected action of the waves or wind. The essence of the concept of the perils of the seas is that the cause of the danger is outside the vessel as differentiated from an internal weakness of the vessel.[7] The additional words "and all other like Perils, Losses and Misfortunes" broadens the coverage only to the extent of insuring against similar perils which might not be within the strict interpretation of the words "perils of the seas" (or the other enumerated

War, Fire, Enemies, Pirates, Rovers, Thieves, Jettisons, Letters of Mart and Counter-Mart, Surprisals, Takings at Sea, Arrests, Restraints and detainments of all Kings, Princes and Peoples of what nation, condition or quality soever, Barratry of the Master and Mariners and of all other like Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment or Damage of the said Vessels, &c., or any part thereof. . . ."

[6]"This insurance also specially to cover total or constructive total loss of vessel directly caused by the following:—

"Accidents in loading, discharging or handling cargo, or in bunkering or in taking in fuel.

"Explosions on shipboard or elsewhere.

"Bursting of boilers, breakage of shafts or any latent defect in the machinery or hull (excluding, however, the cost and expense of repairing or renewing the defective part).

"Negligence of Master, Mariners, Engineers or Pilots, provided such loss or damage has not resulted from want of due diligence by the Owners of the Vessel, or any of them, or by the Managers.

"Masters, Mates, Engineers, Pilots or Crew not to be considered as part owners within the meaning of this clause should they hold shares in the Vessel."

[7]For a comprehensive discussion of the meaning of the phrase "perils of the seas," see 11 Couch on Insurance (2d) §§ 43:87, 43:92, 43:96–101, and the cases cited therein.

perils which were stated in the policy prior to this phrase, but are not pertinent to this case).[8]

Respondent stressed the "all other like perils" phrase when it quoted the coverage clause in its statement of additional authorities, without explaining why it did so. We emphasize that the phrase "and all other like Perils, Losses and Misfortunes," which words were used in the present insurance policy, simply extends coverage to similar perils. Similar clauses in other insurance policies have never been interpreted to convert this coverage clause into an all-risk coverage clause.[9] Therefore, this phrase does not lighten the insured's burden of proof. Respondent also stressed the phrase that stated that the insurance was to be effective when the dredge was towed, again without explanation. We likewise wish to emphasize that this provision was contained in a clause which simply stated that the insurance would be effective under varying kinds of places and uses.[10] It did not broaden the coverage clause with relation to the number or kind of perils insured against.

The "Inchmaree" clause pertains to this case in two respects. It extends the coverage of the policy to include losses caused by "latent" defects, which means weakness in the vessel, which were not discovered even though the vessel was properly surveyed for purposes of determining its seaworthiness and was properly maintained in repair by the owner.[11] The clause also extends the coverage of the insurance to include losses due to negligence of the master, mates, or crew, so long as the negligent party is not the owner.[12] The wording of this clause leaves no doubt that it also is intended to be an enumerated perils clause which simply extends the coverage beyond the standard enumerated perils in the standard marine policy. Under

---

[8]See 11 Couch on Insurance (2d) §§ 43:3-5, and 43:91, third paragraph.

[9]See 11 Couch on Insurance (2d) §§ 43:3-5.

[10]See 11 Couch on Insurance (2d) § 43:94.

[11]See 11 Couch on Insurance (2d) §§ 43:82, 43:84, 43:85.

[12]See the specific wording of the "Inchmaree" clause in footnote 6. Also, see 2 Arnould, Marine Insurance (14th ed., Chorley) § 861a, p. 782.

this clause, the burden of proof is still on the insured to show that the loss was caused by a peril insured against.

The critical question submitted by the parties is whether or not a claim has been proven under the clauses discussed above when the insured claims that the cause of the sinking of the vessel is from an unknown cause.[13] Each party has cited a leading case which supports his position, and each case reaches a directly contrary result on facts so similar as to be substantially identical.

*Watson v. Providence Washington Ins. Co.*, 106 F. Supp. 244 (E.D.N.C., 1952), cited by appellant, is often referred to as the Bertie Kay case. After discussing the problem and the conflict in the applicable cases, the opinion chose

---

[13]The complaint of the respondent alleged as follows:

". . . the said barge for some reason unknown to plaintiff became swamped and sunk in Puget Sound and was and is a total loss."

The additional testimony and discussion between the court and counsel for both sides, during the cross-examination of the skipper of the dredge, was as follows:

"[Appellants' attorney]: Q. What was the weather like when you took the dredge out to the Drew Foss, which then took it in tow? A. Well, it was perfect. It couldn't have been any calmer. Q. You have stated in your opinion that the dredge was in perfect shape, seaworthy, and 'the weather was perfect, it couldn't have been any calmer.' Do you have any opinion as to what caused the dredge to sink?

"[Respondent's counsel]: Objection, your Honor. There is no showing that this man was aboard the dredge, and I think it would just be speculation as to what caused the dredge to sink. If we had somebody who was with the dredge when it sank, that would be different.

"The Court: Let's see. He was familiar with the dredge. He knew what happened. I presume he was there immediately after? A. Pardon?

"The Court: Were you there soon after the dredge sank? A. No.

"The Court: I see. He may express an opinion as to what he thinks due to his qualifications as the skipper. A. I can't very well answer that question, only on a guess. If you want to, a guess, I could probably.

"The Court: No, just your honest opinion as skipper. Q. Are you aware of any fact that in your opinion would have caused that dredge to sink; you can answer that yes or no? A. Yes. I know I have an idea what made it sink. Yes. Q. Do they relate in any way to the condition of the dredge? A. No. Q. Do they relate in any way to the manner in which it was towed? A. Yes."

The position of respondent in this case is clear. It insists that it does not know the cause of the sinking. Appellant accepts this position, and claims that respondent has not sustained its burden of proof that the loss was due to a peril insured against.

what the court believed to be the majority and better reasoned view. It decided that the insured had failed to sustain his burden of proof when the vessel sank in fair weather, and calm water, without explanation.

*Glens Falls Ins. Co. v. Long,* 195 Va. 117, 77 S. E. (2d) 457, 1953 A.M.C. 1841 (1953), was cited by respondent. It also discussed the problem and noted the conflict in the cases, including the case cited by appellant. The court chose what it conceived to be the majority and better reasoned view, namely, that if the vessel is shown to be seaworthy at the start of the voyage, that fact is sufficient to raise a rebuttable presumption that the loss was due to a peril insured against, even though the entry of the water into the vessel was due to an unascertained cause.

This latter case cites considerable authority, some of which was not considered by the court in *Watson v. Providence Washington Ins. Co., supra,* including the annotation in 31 A.L.R. 1378, and *Massey S. S. Co. v. Importers' & Exporters' Ins. Co. of New York,* 153 Minn. 88, 189 N. W. 415, 31 A.L.R. 1372 (1922). We think the annotator's note points out an important aspect of these cases, which we quote, at p. 1378:

"The scope proper of this annotation is limited to those cases in which it was contended by the insurer that a specific cause must be shown; the annotation, therefore, does not purport to treat of the question more frequently presented in cases of sudden or unexplained sinking, namely, Must the insured, in order to recover, affirmatively establish the seaworthiness of the vessel at the inception of the risk? *Nor does it include cases which stop short with the declaration that the insured must prove a loss from causes within the terms of the policy, this being a general rule recognized by even those cases holding that specific cause need not be shown, where to do so is impracticable or impossible.*" (Italics ours.)

We have read many cases concerning proof of losses under marine policies,[14] including those cited in both *Watson*

---

[14]See cases listed in 11 Couch on Insurance (2d) 427 (1960), and cases cited in 31 A.L.R. 1378, annotation, as well as cases cited in *Watson v. Providence Washington Ins. Co., supra,* and *Glens Falls Ins. Co. v. Long, supra.*

*v. Providence Washington Ins. Co., supra,* and *Glens Falls Ins. Co. v. Long, supra.* We believe that it is clear that the presumption that was applied in *Glens Falls Ins. Co. v. Long, supra,* is generally applied *only* after any evidence available to the insured as to the cause of the sinking has been submitted by the insured to the trier of fact for its consideration, and where the vessel was shown to be seaworthy at the start of the voyage. Sometimes the "presumption" was really an inference based upon evidence tending to prove the cause of the sinking, and sometimes the presumption simply shifted the burden of going forward with the evidence by presuming that a prima facie case had been established. The purpose of this latter form of the presumption is to relieve the insured from too heavy a burden in trying to prove what was the cause of the sinking when the evidence thereof is simply impracticable or impossible to produce. The cases do not specifically hold that the insured must come forward with whatever proof he may possess, in a bona fide attempt to prove the cause of the loss, although, the cases are replete with excerpts of testimony of persons who were in a position to know what may have caused the loss of the vessel in each instance.

The case before us is different. Here, the persons who were most likely to be able to shed light on the cause of the sinking were the members of the crew on the tug "Drew Foss." They had charge and control of the dredge. They were present when the dredge sank. Yet the only evidence brought in by respondent was the testimony of its president and the skipper of the dredge. Neither of them was on the scene when the dredge sank. In the words of respondent's counsel, testimony from either of them on the cause of the sinking would be either "hearsay" or "speculation." See footnote 13, *supra.*

■ The record shows that, shortly after the insurer denied liability on respondent's claim, giving as one reason that the loss was not shown to be due to a peril insured against, respondent brought an action against Foss Launch & Tug Co., Inc., to recover $83,000 because of alleged negligence in towing the dredge. This action was settled prior

to trial of the present case. It is only reasonable to suppose that respondent had acquired knowledge of pertinent facts as to the cause of the sinking of the dredge, either at the time of the institution of the action or during the 8 months during which the trial of that action was pending. Since respondent elected not to call any eyewitness to the sinking of the dredge to testify at the trial of this case, against the insurance broker, regarding the vital issue of what caused the dredge to sink, but, instead, tried to rely on the presumption that is only applicable where the cause of the sinking is really unknown, we are constrained to hold that the respondent in this case has failed to produce evidence by which the jury could find that the cause of the loss was "unknown," as that word is used in cases like *Glens Falls Ins. Co. v. Long, supra.* On the facts in the case before us, we believe that the rule expressed in *Watson v. Providence Washington Ins. Co., supra,* is applicable. That opinion states, at 106 F. Supp. 246:

". . . [T]he insured ordinarily is not entitled to recover under a marine insurance policy when the insured vessel sinks in calm water and fair weather without explanation."

We conclude, therefore, that there was no issue of fact for the jury on this point, and that the trial court should have ruled, as a matter of law, that respondent, insured, had failed to sustain its burden of proof to show that the sinking was caused by one of the perils insured against.

Respondent cites *Delanty v. Yang Tsze Ins. Ass'n,* 127 Wash. 238, 220 Pac. 754 (1923), in support of its recovery in this case, quoting extensively from the summary at the end of the case. That case is different from the case before us now because the question was submitted to the jury on conflicting evidence, some of which pertained, apparently, to the vessel's striking some object after starting its return voyage. In the present case, no evidence on the cause of the loss was presented, except speculation by persons not witnesses to the sinking.

It follows from this conclusion that, assuming that appellants were negligent in failing to obtain from the insurer

an endorsement extending the trading limits of the policy for a sufficient length of time, we are constrained to hold that respondent failed to prove that it was damaged by this negligence, because respondent failed to prove that the marine insurance policy would have insured it against this particular sinking even if such endorsement had been obtained.

This conclusion is dispositive of the case. Therefore, we do not reach the question of whether or not the alleged negligence of the tug operators was covered by this policy's "Inchmaree" clause, nor do we reach the question of the effect of the release of the purported subrogation rights.

The judgment of the trial court is reversed with directions to dismiss the action.

OTT, C. J., FINLEY, WEAVER, and HAMILTON, JJ., concur.

March 15, 1965. Petition for rehearing denied.