IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 7, 2008

Charles R. Fulbruge III
Clerk

No. 06-41387

SMI OWEN STEEL COMPANY INC

Plaintiff-Appellee

v.

MARSH USA INC

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before WIENER, DeMOSS, and PRADO, Circuit Judges.

PER CURIAM:

Plaintiff-Appellee SMI Owen Steel Company, Inc. ("SMI"), a subcontractor, sued Defendant-Appellant Marsh USA, Inc. ("Marsh"), an insurance broker, under Nevada law, asserting a tort claim for negligent failure to procure insurance, and two quasi-contractual claims for third-party beneficiary and promissory estoppel. The jury found for SMI on all three claims, and the Magistrate Judge signed a corrected judgment in favor of SMI in the amount of $7,839,131.

On appeal, Marsh argues that the judgment in favor of SMI should be reversed and judgment rendered in its favor, or alternatively that the case should be remanded for a new trial, because (1) SMI failed to prove the causation

element of its negligence claim because the insured-versus-insured exclusion would have precluded coverage under the professional liability ("PL") policy issued by St. Paul Fire & Marine Insurance Company ("St. Paul"); (2) SMI's negligence claim is barred by Nevada's economic loss doctrine; and (3) SMI's third-party beneficiary and promissory estoppel claims fail as a matter of law because SMI was not an intended beneficiary of any contract, Marsh made no promise that it would procure PL insurance for SMI, and SMI did not detrimentally rely on any promise allegedly made by Marsh regarding PL insurance.

We hold that SMI's negligence claim is not barred by Nevada's economic loss doctrine. Furthermore, we conclude that there was a legally sufficient evidentiary basis for a reasonable jury to find that SMI proved the causation element of its negligence claim. Because Marsh's two legal challenges to SMI's negligence claim fail, we affirm the jury verdict on that basis. We note that SMI elected to recover on a theory of negligence, and its damages award was proportionately reduced by Nevada's comparative negligence statute. Because SMI's negligence claim supports the jury verdict, we decline to address Marsh's remaining arguments regarding SMI's third-party beneficiary and promissory estoppel claims.

## I. Factual & Procedural Background

In 1997, Fluor Daniel, Inc. ("Fluor") contracted with Aladdin Gaming, LLC ("Aladdin") to redesign and rebuild the Aladdin Hotel and Casino in Las Vegas, Nevada ("Aladdin Project"). Fluor, the general contractor, retained Marsh, an insurance broker, to administer the "wrap-up" insurance scheme for the Aladdin Project known as a Controlled Insurance Program ("CIP"), which involved procuring different insurance policies covering various participants. As compensation, Marsh received a commission from the insurance companies and a flat fee from Fluor. The insurance provided as part of the CIP scheme

2

consisted of several types of policies, including but not limited to commercial general liability coverage, professional liability coverage, pollution liability coverage, subcontractor default coverage, and excess liability coverage. PL coverage insures against design errors and omissions. Under the contract between Fluor and Aladdin, PL coverage was required for Fluor, Aladdin, and related entities—but not for subcontractors. In May 1998, St. Paul issued a PL policy that listed no subcontractors as additional named insureds.

In December 1997, SMI's winning bid of $38.5 Million enabled it to be retained as a subcontractor to design, engineer, and install the Aladdin Project's structural steel and foundation work. At that time, SMI signed a Letter of Intent with Fluor.

In March 1998, SMI received an Insurance Information Booklet from Marsh stating that enrolled subcontractors of all tiers would be covered by the CIP and provided PL coverage. In June 1998, SMI received the Contractor Handbook, prepared in part by Marsh, which again stated that enrolled subcontractors would be provided PL coverage under the CIP. However, the Handbook cautioned that "if any part of the foregoing is in conflict with a provision of your subcontract agreement, the provisions of the subcontract agreement will govern."

In July 1998, SMI enrolled in the CIP and properly completed all enrollment forms. Although Marsh notes that SMI did not request PL coverage in its CIP enrollment forms, SMI argues that it was not required to complete additional forms to obtain the PL coverage.

In August 1998, SMI signed its subcontract, which was retroactively effective to SMI's December 1997 Letter of Intent. An attachment to SMI's subcontract with Fluor described the CIP and stated that coverage for off-site work and "Design Professional Errors and Omissions Insurance" were "Not Included in the CIP." Under an amendment to SMI's subcontract, SMI was

required to provide a Certificate of Insurance from McNamara/Salvia, SMI's design consultant, showing that McNamara/Salvia had PL coverage and that SMI and Fluor were additional named insureds. This PL coverage, however, only protected SMI for vicarious liability.

In October 1998, Marsh sent Certificates of Insurance to SMI stating that SMI was an additional named insured on Fluor's PL policy. Unknown to SMI, in December 1998, Marsh's project manager for the Aladdin Project, Phil Luecht, advised his employees to stop sending out certificates for PL coverage to subcontractors and to amend the Contractor Handbook. Despite this warning, in September 1999, Marsh sent yet another inaccurate certificate stating that SMI had PL coverage under the CIP. These two inaccurate certificates each contained a capitalized caveat: "This certificate is issued as a matter of information only and confers no rights upon the certificate holder. This certificate does not amend, extend or alter the coverage afforded by the policies below." SMI argues that the Handbook and the two inaccurate certificates led it to detrimentally rely on Marsh to procure PL coverage. Marsh never obtained PL coverage for SMI from St. Paul or any other insurer.

SMI was actually covered by four different insurance policies under the CIP, including a subcontractor default policy. SMI contributed money in the form of bid deductions to purchase this CIP coverage, but SMI never made a bid deduction for PL coverage.

From its inception, the Aladdin Project ran behind schedule. On or about June 1999, several of SMI's subcontractors defaulted, including Black Hawk. As the construction continued, other subcontractors defaulted. SMI's claims for subcontractor default coverage were initially denied by St. Paul, which caused SMI to file a lawsuit against St. Paul and Marsh in federal court in Galveston, Texas ("Galveston Suit").

Because of the multiple defaults of SMI's subcontractors, Aladdin filed claims in an arbitration proceeding against Fluor. Subsequently, Fluor filed a related cross-action in the arbitration proceeding against SMI, alleging that SMI breached its contract, failed to properly design and fabricate its portions of the Aladdin Project, and failed to perform satisfactorily its professional design and construction duties ("Arbitration Proceeding").

St. Paul and SMI eventually reached a settlement in the Galveston Suit. As part of this settlement, SMI released all claims against St. Paul, including claims for coverage under the subcontractor default and PL policies. St. Paul agreed to pay additional amounts if the arbitration among St. Paul, Fluor, and SMI settled. Despite its settlement with St. Paul, SMI continued to pursue its claims against Marsh in the Galveston Suit.

The Arbitration Proceeding eventually settled. SMI's share of the settlement was $3.5 Million paid to Fluor and Aladdin. St. Paul paid $2.25 Million of the amount, and SMI paid the remaining $1.25 Million.

SMI was forced to defend itself against Fluor in the Arbitration Proceeding without any defense or indemnity provided by the PL coverage that SMI believed was provided by the CIP. After SMI settled with St. Paul in the Galveston Suit, SMI amended its complaint to assert tort and quasi-contractual claims based on Marsh's alleged failure to procure PL insurance. SMI argues that if Marsh had secured PL coverage for SMI, then SMI would have been reimbursed for the attorneys' fees incurred by SMI in the Arbitration Proceeding and the $1.25 Million it contributed to the settlement with Fluor and Aladdin. SMI sought an additional $6.6 Million in damages from Marsh because SMI released its claim for the unpaid subcontract value as part of its settlement with Fluor. These damages were not a part of SMI's settlement with St. Paul.

The case was tried by consent before the Magistrate Judge. The court ruled that Nevada substantive law applied, and the parties do not contest that

ruling. During the proceedings, Marsh twice moved for judgment as a matter of law, and the court denied both motions. The jury returned a verdict against Marsh on SMI's claims for negligence, and the jury also found that SMI was a third-party beneficiary of the oral contract between Fluor and Marsh and was entitled to recovery under the theory of promissory estoppel.[1] SMI elected to recover on a theory of negligence, and the damages award was proportionately reduced by Nevada's comparative negligence statute. The jury found SMI comparatively negligent for 12% of its damages. On July 31, 2006, SMI was awarded a final judgment of $7,839,131, including interest and costs. The court overruled Marsh's post-judgment motions for judgment as a matter of law and for new trial, and Marsh filed a timely appeal.

## II. Analysis

### A. Erie Guess

The parties agree that Nevada law applies to this diversity action.[2] See Erie R. Co. v. Tompkins, 304 U.S. 64, 78-80 (1938). Because of the absence of authority from the Nevada Supreme Court, we must make an Erie guess about how the Nevada Supreme Court would evaluate the causation and economic loss arguments related to the negligence claim.[3] Am. Int'l Specialty Lines Ins. Co. v.

---

[1] The contract between Fluor and Marsh was oral. On March 9, 2000, Ed O'Dwyer wrote a memo to David Benoit, a Fluor representative, which stated that "we never achieved a position where we signed a broker service agreement," but payments were made to Marsh under a "flat fee billing format." In addition to the flat fee from Fluor, Marsh received "commissions on policy placements."

[2] On April 29, 2003, the district court conducted a choice of law analysis and ruled that "Nevada law most logically applies to this dispute, which arose out of contracts for the construction of a Nevada hotel."

[3] Nevada is one of eleven states that do not have any intermediate appellate courts. Supreme Court of Nevada, Report to the 74th Regular Session of the Nevada State Legislature, 2007, Regarding the Creation of the Nevada Court of Appeals (March 2007), at 8 n.20, http://www.nvsupremecourt.us/documents/reports/rpt_IAC_2007.pdf. Consequently, we cannot rely on any intermediate appellate court cases from Nevada to guide our decision. See Howe ex rel. Howe v. Scottsdale Ins. Co., 204 F.3d 624, 627 (5th Cir. 2000) ("In making an Erie guess

Canal Indem. Co., 352 F.3d 254, 260 (5th Cir. 2003). "In the absence of a final decision by the state's highest court on the issue at hand, it is the duty of the federal court to determine, in its best judgment, how the highest court of the state would resolve the issue if presented with the same case." Id. In making the Erie guess, we may consider, among other sources, treatises, decisions from other jurisdictions, and the "majority rule." Am. Indem. Lloyds v. Travelers Prop. & Cas. Ins. Co., 335 F.3d 429, 435 (5th Cir. 2003). "In that effort, [a]bsent evidence to the contrary, we presume that the [Nevada] courts would adopt the prevailing rule if called upon to do so." Turbo Trucking Co. v. Those Underwriters at Lloyd's London, 776 F.2d 527, 529 (5th Cir. 1985) (internal quotation marks omitted) (first alteration in original).

B. The Causation Issue

1. Standard of Review

Marsh moved for judgment as a matter of law three times (twice at trial and once post-trial), arguing that SMI presented insufficient evidence of causation regarding its claim for negligent failure to procure insurance. "A motion for judgment as a matter of law . . . in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." Hiltgen v. Sumrall, 47 F.3d 695, 699 (5th Cir. 1995). Although we review denial of a motion for judgment as a matter of law de novo, we note that "our standard of review with respect to a jury verdict is especially deferential." Flowers v. S. Reg'l Physician Servs., Inc., 247 F.3d 229, 235 (5th Cir. 2001) (internal quotation marks omitted); Brown v. Bryan County, Okla., 219 F.3d 450, 456 (5th Cir. 2000). "A motion for judgment as a matter of law should be granted if 'there is no legally sufficient evidentiary basis for a reasonable jury to find for a party.'"

---

in the absence of a ruling from the state's highest court, this Court may look to the decisions of intermediate appellate state courts for guidance.").

Pineda v. United Parcel Serv., Inc., 360 F.3d 483, 486 (5th Cir. 2004) (quoting FED. R. CIV. P. 50(a)). A court should grant a motion for judgment as a matter of law only when "the facts and inferences point so strongly in favor of the movant that a rational jury could not reach a contrary verdict." Id. (internal quotation marks omitted). "In entertaining a Rule 50 motion for judgment as a matter of law [we] must review all of the evidence in the record, draw all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh the evidence." Ellis v. Weasler Eng'g Inc., 258 F.3d 326, 337 (5th Cir. 2001). However, we will not sustain a jury verdict based only on a "mere scintilla of evidence." Brady v. Houston Indep. Sch. Dist., 113 F.3d 1419, 1422 (5th Cir. 1997) (internal quotation marks omitted).

### 2. Negligent Failure to Procure Insurance

In at least three separate cases, the Nevada Supreme Court has recognized the viability of a claim against an insurance broker for negligent failure to procure insurance. Lucini-Parish Ins., Inc. v. Buck, 836 P.2d 627, 629 (Nev. 1992); Keddie v. Beneficial Ins., Inc., 580 P.2d 955, 956 (Nev. 1978); Havas v. Carter, 515 P.2d 397, 399 (Nev. 1973).

In Havas, the Nevada Supreme Court recognized that an insurance broker "who undertakes to procure insurance for another owes an obligation to his client to use reasonable diligence in attempting to place the insurance and to seasonably notify the client if he . . . is unable to obtain the insurance." 515 P.2d at 399. Regarding the duty element of the claim, the court stated that insurance brokers are "not obligated to assume the duty of procuring . . . insurance, but when they [do] so the law impose[s] upon them the duty of performance in the exercise of ordinary care for the rights and interests of the [intended purchasers]." Id. The question of whether a broker exercised "the care and diligence that [the] undertaking required" is a question of fact for the jury. Id. In Havas, the court held that the plaintiff failed to establish negligence because

the broker made reasonable efforts to procure the special type of insurance demanded by the plaintiff, and the broker seasonably notified the plaintiff of his inability to procure it. Id.

In Keddie, the Nevada Supreme Court repeated that "[o]nce an agreement to procure insurance has been reached the insurance agent is obliged to use reasonable diligence to place the insurance and seasonably to notify the client if he is unable to do so." 580 P.2d at 956 (citing Havas, 515 P.2d at 399). Regarding the causation element, the court stated that "[t]he agreement to procure . . . must be one for a policy of insurance which would have covered the loss incurred." Id. Keddie owned a commercial fishing boat, but he submitted an application to his insurance broker for a yacht insurance policy that only covered damage to boats not used for commercial purposes. Id. at 955. In holding that Keddie failed to prove causation, the court observed that the yacht insurance policy would not have covered the loss incurred even if the broker had procured the policy pursuant to Keddie's application. Id. at 956.

In Buck, two horse owners ("the Bucks") brought an action against an insurance broker for failure to procure equine mortality insurance. 836 P.2d at 628. The Bucks had insured several horses through Lucini-Parish Insurance ("LPI") and always followed the same procedures. Id. The Bucks decided to purchase a thoroughbred horse named Bluegrass for $75,000. Id. An employee of the Bucks called LPI and spoke with an LPI representative about adding Bluegrass to the Bucks' existing Lloyds of London policy. Id. After giving the LPI representative the necessary information and faxing her the veterinarian's certificate and bill of sale, the employee believed that Bluegrass was insured. Id. Unkown to the Bucks, LPI lacked binding authority with respect to equine mortality insurance. Id. The LPI representative forwarded the application via regular mail to a local agent with binding authority. Id. at 629. Bluegrass died

shortly thereafter, and LPI informed the Bucks that Bluegrass was not yet insured at the time of death. Id.

The jury returned a verdict in favor of the Bucks on their breach of contract and negligent failure to procure insurance claims. Id. In affirming the judgment, the Nevada Supreme Court approved of the following jury instruction on the negligence claim: "An insurance agency that undertakes to procure insurance for another owes an obligation to its client to use reasonable diligence in attempting to place the insurance and to seasonably notify the client if it, the insurance agency, is unable to obtain the insurance." Id. at 629 (emphasis in original). "The insurance" referred to in the jury instructions was the insurance that LPI actually agreed to procure: adding Bluegrass to the Bucks' existing Lloyds of London policy. Id. at 629-30.

Thus, as recently as 1992, the Nevada Supreme Court has recognized the viability of a cause of action against an insurance broker for breach of contract and negligent failure to procure insurance.

### 3. Lack of Causation as an Affirmative Defense

Havas, Keddie, and Buck are unclear as to which party carries the burden of proof regarding causation. In cases involving a claim against an insurance broker for negligent failure to procure insurance, a minority of jurisdictions hold that the causation issue raised by Marsh is an affirmative defense. See Hans Coiffures Int'l, Inc. v. Hejna, 469 S.W.2d 38, 40 (Mo. Ct. App. 1971); see also Patterson Agency, Inc. v. Turner, 372 A.2d 258, 261 (Md. Ct. Spec. App. 1977). A majority of jurisdictions hold that causation is considered an element of the offense that must be proven by the plaintiff by a preponderance of the evidence. See Pac. Dredging Co. v. Hurley, 397 P.2d 819, 822 (Wash. 1964); see Bayly, Martin & Fay, Inc. v. Pete's Satire, Inc., 739 P.2d 239, 243-44 (Colo. 1987) (en banc); see MacDonald v. Carpenter & Pelton, Inc., 298 N.Y.S. 2d 780, 784 (1969). Because the Nevada Supreme Court cited to Pacific Dredging when it discussed

causation in Keddie, we conclude that the Nevada Supreme Court would adopt the majority approach regarding the burden of proof for causation. See Keddie, 580 P.2d at 956. In Nevada, the plaintiff carries the burden of proof regarding the causation element of a negligence claim, and we see no reason why SMI's claim for negligent failure to procure insurance would be subject to a different rule. See Scialabba v. Brandise Const. Co., 921 P.2d 928, 968 (Nev. 1996).

4.      Legally Sufficient Evidentiary Basis

Marsh is correct in observing that it is liable only if the insurance policy "would have covered the loss incurred." Keddie, 580 P.2d at 956. Marsh argues that SMI failed to establish the causation element because the St. Paul policy it procured for Fluor would have contained an insured-versus-insured exclusion that would have precluded PL coverage for subcontractors who were listed as additional named insureds under the St. Paul policy. Thus, SMI suffered no damages for not being named as an additional named insured on Fluor's PL policy because that policy would never have covered SMI's damages resulting from Fluor's claims against SMI in the Arbitration Proceeding. According to Marsh, there was no evidence that St. Paul or Fluor would have been willing to delete the exclusion if any subcontractors were added to the PL policy.[4]

---

[4] In addition to arguing that it would have been covered under the PL policy issued by St. Paul, SMI also argues that Marsh could have obtained a PL policy for SMI from an insurance company other than St. Paul. See Pete's Satire, 739 P.2d at 244 ("Where . . . a claim for relief is predicated on the negligent failure of an insurance broker . . . to procure a particular type of insurance coverage sought by the plaintiff, it is incumbent upon the plaintiff to prove by a preponderance of evidence, as an aspect of causation and damages, that such insurance was generally available in the insurance industry when the broker or agent obtained insurance coverage for the plaintiff."). Tom Veitch, SMI's insurance expert, testified that "this policy didn't have to be with St. Paul. It could have been with another company. Marsh still had the responsibility to provide the policy . . . ." SMI argues that it did not specifically request that its PL policy be issued by St. Paul and that PL coverage was generally available in the insurance industry, so the insured-versus-insured exclusion is irrelevant. We decline to address this issue because we find that a reasonable jury could have concluded that St. Paul would have deleted the insured-versus-insured exclusion for enrolled subcontractors.

At trial, SMI produced more than a scintilla of evidence indicating that (1) Marsh and Fluor initially intended to obtain PL coverage for subcontractors of all tiers;[5] (2) Marsh submitted a binder proposal to St. Paul requesting PL coverage for enrolled subcontractors;[6] (3) the scope of coverage under the PL

---

[5] On January 15, 1998, Phil Luecht, a Marsh representative, wrote in a memo that "Fluor wants to bond professional subcontractors. St. Paul agreed to relook at this exclusion." On February 9, 1998, Leucht wrote a memo to St. Paul regarding "Project Professional" coverage stating that "[b]oth options need to include subcontractor design firms without limitation. This will be treated as a wrap up. I need to get more information on the sub design firms." On February 11, 1998, Luecht wrote in a memo that "[c]ertain design work will be subcontracted and coverage must provide limits either excess of the design firm's own limits for the benefit of Marshall and the owner, or primary insurance—depending upon the level of bid deducts we can obtain." On February 13, 1998, Luecht wrote in a memo to Fluor that "St. Paul has quoted professional liability . . . . We need to advise them what, if any, design work will be subcontracted." In December 29, 1998, Luecht wrote a memo to St. Paul stating that "[s]ince this is a project professional placement, all enrolled subcontractors and their sub-tiers should be included for coverage." Leucht testified during trial that they called the CIP a "wrap-up" because "it's intended to include all the participants on the job sites for certain coverages." Most significantly, the jury heard Leucht testify to the following during trial:

Q:     I understand. But—so, the answer to the question is yes, that was—as of February 9, 1998, all subcontractors would be included without limitation?

A:     That was the goal that was brought out of this wording that we were trying to negotiate.

Q:     And that was the intent of Marsh McLennan to obtain that?

A:     My job is to try and negotiate the broadest coverage available.

Q:     Was that the intent of Marsh McLennan to obtain the broadest coverage obtainable?

A:     At this point in time, that's my intent.

Q:     And that was the intent expressed to you by your client, Fluor?

A:     That was what they asked for.

[6] On February 9, 1998, St. Paul asked Marsh for "coverage required of all professional subs." On February 27, 1998, Luecht sent St. Paul a binder proposal that included SMI as an additional named insured under the PL policy. In response to Marsh's request to include all subcontractors as insureds under the PL policy, St. Paul stated the following: "I thought we had decided to only cover Fluor, Marshall, Aladdin & get the other subcontractors to provide their own."

12

policy issued by St. Paul was negotiable;[7] (4) a Marsh representative made a verbal assurance to SMI that "there was no need for professional liability insurance";[8] (5) the actual policy issued by St. Paul deleted the insured-versus-insured exclusion through endorsement;[9] and (6) the Insurance Information Booklet, the Contractor Handbook, and the two Certificates of Insurance issued by Marsh all stated that SMI had PL coverage under the CIP. Because our review of the causation issue is "especially deferential," we conclude that there was a legally sufficient evidentiary basis for a reasonable jury to find that SMI has proven the causation element of its negligence claim.[10]

---

[7] Marsh's insurance expert, Professor Jeffrey Stempel, testified that the issuance of a PL policy for SMI's benefit with respect to Fluor's claims was possible, the only issues were price and obtaining information on the insured. SMI's insurance expert, Tom Veitch, testified that the issue of whether St. Paul would have deleted the exclusion for subcontractors was "all speculation as to what would have been negotiated out" between St. Paul and Marsh. Based on this expert testimony, the jury could reasonably conclude that the scope of the insured-versus-insured exclusion in St. Paul's PL policy was negotiable.

[8] A reasonable jury could have found that David Risko, a Marsh representative, stated to an SMI representative during a meeting on April 2, 1998 that there was "no need for professional liability insurance." Bill Saunders, an SMI representative, understood this statement to mean that SMI did not need professional liability coverage because it was provided under the CIP.

[9] We agree with SMI's argument that the jury was entitled to rely on the actual PL policy issued by St. Paul and conclude that SMI, like Aladdin, could have been an additional named insured that was not subject to the insured-versus-insured exclusion. Furthermore, we reject Marsh's argument that St. Paul and Fluor would never have agreed to delete the exclusion because Marsh's preliminary negotiations with St. Paul, Marsh's binder proposal, the Insurance Information Booklet, the Contractors Handbook, and the two Certificates of Insurance all contemplated that PL coverage was available for subcontractors like SMI.

[10] We acknowledge that Marsh presented some evidence supporting its lack of causation argument. On February 13, 1998, Lisa Davis, a St. Paul representative, stated that "[w]e are not willing to delete [the insured-versus-insured exclusion] entirely if we are also adding subcontractors." At trial, a St. Paul underwriter testified that they would not delete the exclusion for subcontractors because St. Paul "[doesn't] want the policy to become an asset that [the sub design firm and the primary designer] will claim against each other for just normal contract disputes." At trial, a Fluor representative testified that Fluor was "very adamant" about not deleting the exclusion for subcontractors. Under our standard of review, we may not make credibility determinations or weigh the evidence. Viewing all reasonable inferences in favor of SMI, we are unwilling to disturb the jury verdict regarding causation.

C.    The Economic Loss Issue

1.    Standard of Review

Because the applicability of Nevada's economic loss doctrine is a question of law, we review the issue de novo.  Howe ex rel. Howe v. Scottsdale Ins. Co., 204 F.3d 624, 627 (5th Cir. 2000); see also Salve Regina Coll. v. Russell, 499 U.S. 225, 231 (1991).

2.    Nevada's Economic Loss Doctrine

Marsh argues that SMI's negligence claim is barred by Nevada's economic loss doctrine.  See Jordan v. State ex. rel. Dep't of Motor Vehicles & Pub. Safety, 110 P.3d 30, 51 (Nev. 2005); see also Calloway v. City of Reno, 993 P.2d 1259, 1270 (Nev. 2000), overruled on other grounds by Olson v. Richard, 89 P.3d 31, 32-33 (Nev. 2004); see also Local Joint Executive Bd. of Las Vegas v. Stern, 651 P.2d 637, 638 (Nev. 1982).  According to Marsh, SMI's only damages are for an economic loss—the loss of insurance proceeds, and the economic loss doctrine precludes recovery in tort for this "expectancy interest."  Marsh argues that "Nevada's version of the economic loss doctrine is extremely broad" and applies to the facts of this case.

The Ninth Circuit recently issued a detailed opinion regarding the scope of Nevada's economic loss doctrine.  See Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 872-79 (9th Cir. 2007).  In Giles, the Ninth Circuit held that the economic loss doctrine did not bar the plaintiffs' fraud and conversion claims.  Id. at 879.  In holding that the economic loss doctrine did not apply to intentional torts, the Ninth Circuit described the nature of the economic loss doctrine:

> Broadly speaking, the economic loss doctrine is designed to maintain a distinction between damage remedies for breach of contract and for tort. The term "economic loss" refers to damages that are solely monetary, as opposed to damages involving physical harm to person or property. The economic loss doctrine provides that certain economic losses are properly remediable only in contract. The doctrine has roots in common law limitations on

recovery of damages in negligence actions in the absence of physical harm to person or property.

Giles, 494 F.3d at 873. The Ninth Circuit recognized that outside the products liability context, the economic loss doctrine "has produced difficulty and confusion." Id. at 874.

Marsh cites to language from Stern, which states the following:

> The well established common law rule is that absent privity of contract or an injury to person or property, a plaintiff may not recover in negligence for economic loss . . . . The primary purpose of the rule is to shield a defendant from unlimited liability for all of the economic consequences of a negligent act, particularly in a commercial or professional setting, and thus to keep to the risk of liability reasonably calculable.

651 P.2d at 638 (emphasis added). Because SMI's tort claim is based on Marsh's professional negligence in a commercial setting, Marsh argues that the economic loss doctrine bars the claim.

When making an Erie guess, "[o]ur task is to attempt to predict state law, not to create or modify it." Herrmann Holdings, Ltd. v. Lucent Techs., Inc., 302 F.3d 552, 558 (5th Cir. 2002) (internal quotation marks omitted). No Nevada Supreme Court case had held that the economic loss doctrine bars a claim against an insurance broker for negligent failure to procure insurance. Furthermore, the Nevada Supreme Court has recognized the viability of this particular negligence claim even after Stern was decided.[11] See Buck, 836 P.2d

---

[11] At oral argument, Marsh argued that the Buck affirmance was based solely on the breach of contract claim. We disagree. In Buck, the Nevada Supreme Court explicitly approved of a jury instruction regarding a claim for negligent failure to procure insurance and affirmed a judgement for the plaintiffs based on both breach of contract and negligence. See Buck, 836 P.2d at 629-30. We conclude that SMI could elect to recover on either theory. See Malfabon v. Garcia, 898 P.2d 107, 109 (Nev. 1995) ("We have traditionally held that a client may bring [a legal malpractice] action against an attorney based on either a negligence or contractual theory."); see also Keller Lorenz Co. v. Ins. Assocs. Corp., 570 P.2d 1366, 1369 (Idaho 1977) (claim for failure to procure insurance may be grounded in either contract or tort, but double recovery is not allowed); see Hursh Agency, Inc. v. Wigwam Homes, Inc., 664 P.2d

at 629. The Nevada Supreme Court has held that the economic loss doctrine applies in certain products liability cases,[12] construction defect cases,[13] and negligence cases that do not involve the violation of a professional, extra-contractual duty imposed by law.[14]

We conclude that Nevada's economic loss doctrine does not bar negligence claims involving the violation of a professional, extra-contractual duty imposed by law.[15] According to Calloway, the applicability of the economic loss doctrine hinges upon "whether the actions or omissions complained of constitute a violation of duties imposed by law, or of duties arising by virtue of the alleged

---

27, 32 (Wyo. 1983) (same).

[12] See Cent. Bit Supply, Inc. v. Waldrop Drilling & Pump, Inc., 717 P.2d 35, 36-37 (Nev. 1986) (negligence and strict liability claims regarding defective drill bit); see also Nat'l Union Fire Ins. Co. v. Pratt & Whitney, 815 P.2d 601, 603-04 (Nev. 1991) (negligence and strict liability claims regarding defective airplane engine); see also Arco Prods. Co. v. May, 948 P.2d 263, 266 (Nev. 1997) (negligence and strict liability claims regarding defective cash registers).

[13] See Calloway, 993 P.2d at 1267 (negligence claims against developer and contractor for defective roofing and siding).

[14] See Stern, 651 P.2d at 638 (negligence and strict liability claims against designers and builders of a hotel for lost salaries and employment benefits resulting from fire); see also Jordan, 110 P.3d at 51 (negligence claim against a hotel owner for failing to inform the plaintiff that one of the hotel's guests was a known con artist). One district court has held that a tort claim for negligent supervision and retention was barred by the economic loss doctrine despite the fact that the Nevada Supreme Court recognized post-Stern that this tort claim is premised on an extra-contractual duty of care. See Blanck v. Hager, 360 F. Supp. 2d 1137, 1157 (D. Nev. 2005). The Ninth Circuit did not address the economic loss doctrine when it affirmed the district court's decision. See Blanck v. Hager, 220 F. App'x 697 (9th Cir. 2007). Blanck is distinguishable from this case because the defendant in Blanck did not provide any professional services to the plaintiff. We express no opinion on whether Nevada's economic loss doctrine bars tort claims that have been recognized by the Nevada Supreme Court but do not involve professional malpractice.

[15] We note that legal malpractice claims sounding in tort are still viable in Nevada post-Calloway. See Hewitt v. Allen, 43 P.3d 345, 220-21 (Nev. 2002). Like the duty of care owed by an insurance broker, it is the "contractual relationship creating a duty of care upon an attorney which is the primary essential to a recovery for legal malpractice." Compare Warmbrodt v. Blanchard, 692 P.2d 1282, 1285 (Nev. 1984) (internal quotation marks and brackets omitted), with Keddie, 580 P.2d at 956.

16

express agreement between the parties." 993 P.2d at 1263 (internal quotation marks omitted). In Havas, the Nevada Supreme Court stated that insurance brokers are "not obligated to assume the duty of procuring . . . insurance, but when they [do] so the law impose[s] upon them the duty of performance in the exercise of ordinary care for the rights and interests of the [intended purchasers]."[16] 515 P.2d at 399 (emphasis added). The cases cited by Marsh are not factually analogous and do not convince us that the Nevada Supreme Court would hold that the doctrine bars all negligence claims, without exception, including those involving the violation of a professional, extra-contractual duty imposed by law.[17] This case does not involve products liability or construction defects. Furthermore, in Stern and Jordan, the defendants did not owe any professional, extra-contractual duties to the plaintiffs under established Nevada Supreme Court precedent.

The Ninth Circuit has concluded that "Nevada's economic loss doctrine is generally consistent with the principles discernable in the case law of other jurisdictions." Giles, 494 F.3d at 879. Based on our review of case law from other jurisdictions, we conclude that the majority of those jurisdictions hold that the economic loss doctrine does not bar a claim against an insurance broker for negligent failure to procure insurance. See Grynberg v. Agri Tech, Inc., 10 P.3d 1267, 1271 & n.4 (Colo. 2000) (en banc); see Kanter v. Deitelbaum, 648 N.E.2d 1137, 1139-40 (Ill. App. Ct. 1995); see Steiner Corp. v. Johnson & Higgins, 196

---

[16] "The governing issue [in determining whether a claim falls within the professional services exception of the economic loss doctrine] is whether the law imposed upon [the defendant] a duty of care." Springfield Hydroelectric Co. v. Copp, 779 A.2d 67, 72 n.2 (Vt. 2001).

[17] In refusing to adopt this blanket rule, we are heeding the Nevada Supreme Court's warning that "the more reasoned method of analyzing the [applicability] of the economic loss doctrine is to examine the relevant policies in order to ascertain the proper boundary between the distinct civil law duties that exist separately in contract and tort." Calloway, 993 P.3d at 1266 n.3.

F.R.D. 653, 656-57 (D. Utah 2000). We believe that the reasoning of Kanter, which held that the economic loss rule does not bar recovery, is persuasive:

> The economic loss doctrine applies to the service industry only where the duty of the party performing the service is defined by the contract between him and his client. Where a duty arises outside of that contract, the doctrine does not prohibit recovery under a tort theory for the negligent breach thereof . . . . We find that this failure was a breach of his duty to observe reasonable professional competence which existed independently of the insurance policy or contract. We therefore find that [the insurance broker's] duty to plaintiffs, his insureds, in performing insurance brokerage services was not solely defined by contract, but rather was extracontractual in nature. As such, the economic loss doctrine does not bar plaintiffs' recovery of their economic damages under a tort theory for [the insurance broker's] negligent breach.

648 N.E.2d at 1140 (citations omitted). We also agree with the Colorado Supreme Court's conclusion that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." Grynberg, 10 P.3d at 1269 (emphasis added). We believe that the Nevada Supreme Court has imposed "an independent duty of care" on insurance brokers. See id. at 1271 n.4; see Havas, 515 P.2d at 399.

The Kanter rationale is supported by the Second Circuit's holding that the economic loss doctrine allows recovery "in the limited class of cases involving liability for the violation of a professional duty. To hold otherwise would in effect bar recovery in many types of malpractice actions." Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 18 (2d Cir. 2000) (New York law). Marsh did not cite to any cases from other jurisdictions explicitly holding that the economic loss doctrine bars recovery on a tort claim for negligent failure to procure insurance. We conclude that the Nevada Supreme Court would hold that the economic loss doctrine does not bar SMI's negligence claim.

18

## III. Conclusion

On appeal, Marsh raised two narrow issues regarding SMI's tort claim for negligent failure to procure insurance: (1) SMI failed to prove the causation element of its negligence claim because the insured-versus-insured exclusion would have precluded coverage under St. Paul's professional liability policy, and (2) SMI's negligence claim is barred by Nevada's economic loss doctrine. We reject both of these arguments, and we affirm on the basis of the negligence claim.[18]  Consequently, we find it unnecessary to consider SMI's quasi-contractual claims.

AFFIRMED.

---

[18] The Magistrate Judge also denied Marsh's motion for new trial. Our standard of review of a denial of a motion for new trial is "more deferential than our review of the denial of a motion for judgment as a matter of law." DP Solutions, Inc. v. Rollins, Inc., 353 F.3d 421, 431 (5th Cir. 2003) (internal quotation marks omitted). Because there was no "clear showing of an abuse of discretion," we will not disturb the Magistrate Judge's ruling on this issue. See id.; see also Hidden Oaks Ltd. v. City of Austin, 138 F.3d 1036, 1049 (5th Cir. 1998) ("In light of our previous holding that the district court correctly denied the City's motion for judgment as a matter of law . . ., we find no abuse of discretion in the district court's denial of the City's motion for a new trial.").