# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 29, 2014

Lyle W. Cayce
Clerk

No. 13-60599

JACKSON WOMEN'S HEALTH ORGANIZATION, on behalf of itself and its patients; WILLIE PARKER, M.D., M.P.H., M.Sc., on behalf of himself and his patients,

Plaintiffs – Appellees

v.

MARY CURRIER, M.D., M.P.H., in her official capacity as State Health Officer of the Mississippi Department of Health; ROBERT SHULER SMITH, in his official capacity as District Attorney for Hinds County, Mississippi,

Defendants – Appellants

Appeal from the United States District Court
for the Southern District of Mississippi

Before JOLLY, GARZA, and HIGGINSON, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Given that the Supreme Court long ago determined that the Constitution protects a woman's right to choose an abortion, the ultimate issue in this appeal is whether the State of Mississippi can impose a regulation that effectively will close its only abortion clinic. The State of Mississippi, however, argues that Mississippi citizens can obtain an abortion in Tennessee, Louisiana, or Alabama without imposing an undue burden upon Mississippi citizens in the exercise of their constitutional rights.

No. 13-60599

Today, we follow the principle announced by the Supreme Court nearly fifty years before the right to an abortion was found in the penumbras of the Constitution and hold that Mississippi may not shift its obligation to respect the established constitutional rights of its citizens to another state.  Such a proposal would not only place an undue burden on the exercise of the constitutional right, but would also disregard a state's obligation under the principle of federalism—applicable to all fifty states—to accept the burden of the non-delegable duty of protecting the established federal constitutional rights of its own citizens.

In April 2012, the Mississippi Legislature passed House Bill 1390 ("H.B. 1390" or "the Act").  Mississippi Governor Phil Bryant signed the Act, and it was scheduled to take effect on July 1, 2012.  As relevant to this appeal, the admitting privileges provision of H.B. 1390 requires that "[a]ll physicians associated with the abortion facility must have admitting privileges at a local hospital and staff privileges to replace local hospital on-staff physicians."  Before the passage of H.B. 1390, Mississippi law required that abortion facilities have only a transfer agreement with a local hospital, a written agreement for backup care with a physician with admitting privileges, and at least one affiliated doctor with admitting privileges.  Miss. Admin. Code 30-17-2635:2.5(B), (F).

The Jackson Women's Health Organization ("JWHO") operates the only licensed abortion clinic in Mississippi ("the Clinic").  Three doctors are affiliated with the Clinic: Dr. Willie Parker, Dr. Doe, and Dr. Roe.[1]  Dr. Parker and Dr. Doe provide the majority of the abortion services, while Dr. Roe

---

[1] The district court allowed Dr. Doe and Dr. Roe to participate in this action under pseudonyms.

2

No. 13-60599

provides only "extremely limited abortion services." Neither Dr. Parker nor Dr. Doe have admitting privileges at a local hospital, but Dr. Roe does.

The defendants, Mary Currier and Robert Smith (collectively, "the State"), are Mississippi officials. They appeal the district court's entry of a preliminary injunction enjoining the enforcement of the admitting privileges provision of H.B. 1390. We AFFIRM the district court's judgment entering the preliminary injunction, as herein MODIFIED to limit it, in this "unconstitutional as applied" appeal, to these parties and this case.

I.

Several days before H.B. 1390's effective date, JWHO filed this suit in the federal district court. JWHO sought both a temporary restraining order and a preliminary injunction barring the enforcement of the admitting-privileges provision.[2] The district court granted the temporary restraining order. The district court also granted, in part, JWHO's motion for preliminary injunction. Specifically, the district court allowed the State to enforce the admitting-privileges provision, thereby requiring JWHO's doctors to seek admitting privileges. But the district court enjoined the State from imposing any civil or criminal penalties on JWHO for the continuing operation of the Clinic while its doctors sought the privileges.

Consistent with the district court's order, Drs. Parker and Doe sought admitting privileges at seven of the Jackson-area hospitals, but no hospital was willing to grant either of the doctors these privileges.[3] The hospitals

---

[2] JWHO's initial complaint also challenged another portion of H.B. 1390—a requirement that all physicians associated with an abortion clinic be board certified or eligible in obstetrics and gynecology. JWHO did not, however, seek to enjoin this provision, so no challenge to it is before this court.

[3] In denying the doctors' applications for admitting privileges, the local hospitals cited reasons relating to the doctors' provisions of abortion services, such as: "[t]he nature of your proposed medical practice is inconsistent with this Hospital's policies and practices as concerns abortion and, in particular, elective abortion," and "[t]he nature of your proposed

maintained this stance despite the doctors' request that they reconsider. The State subsequently denied JWHO's request for a waiver for Drs. Parker and Doe, found that the Clinic was not in compliance with H.B. 1390, and sent JWHO an official notice of hearing for revocation of JWHO's license to perform abortions.

In the light of this impending hearing, JWHO filed a second motion for a preliminary injunction. JWHO argued that, by closing the only clinic in Mississippi, the law would impose an undue burden on women's right to choose abortions. The State responded that the law would not impose an undue burden because the Act would, at most, increase travel time and costs for women seeking an abortion. These women could travel to abortion clinics in other states that are not prohibitively far away. Taking the Jackson area as an example, the State pointed to abortion clinics in Baton Rouge, New Orleans, and Memphis that are no farther than three hours away. Because this increase in travel would only be an incidental burden on the right to an abortion, the State argued that H.B. 1390 was constitutional.

The district court granted the preliminary injunction. As a factual matter, the district court found that allowing enforcement of the Act would close the Clinic because JWHO could not comply with the Act. Moving to the legal analysis, the district court held that JWHO had demonstrated a substantial likelihood of success on the merits because the Act created an undue burden. Notwithstanding the other clinics that are within a few hours' drive, the district court held that the proper analysis looked to the availability of abortions within the State of Mississippi. Seeing that the only clinic would

---

medical practice would lead to both an internal and external disruption of the Hospital's function and business within this community."

be closed by enforcing the Act, the district court held that an undue burden would likely result.

Similarly, the district court held that JWHO had established a substantial threat of irreparable harm in the form of the impending closure of the Clinic.  Finally, the district court held that the balance of harms cut in favor of JWHO as the preliminary injunction would merely maintain the status quo, and the court held that the injunction would not disserve the public interest because it would prevent constitutional deprivations.  Having found the four factors of the preliminary injunction test satisfied, the district court enjoined the State from enforcing the admitting privileges provision.

The State then filed a Rule 52(b) motion to clarify.  First, the State asked the district court to clarify whether its legal conclusion was that any regulation that would act to close the Clinic would be "per se unconstitutional."   The district court only addressed this argument insofar that it reiterated that the challenge was to the Act as-applied, and therefore was based on the facts before the court.  Second, the State asked the district court to clarify a footnote in the original order which highlighted a lack of clarity in abortion jurisprudence related to the necessity of a challenged regulation.  In its Rule 52(b) order, the district court reiterated that it did not undertake any necessity inquiry as it was not something raised by the parties, and that even if it did undertake a necessity inquiry, the Act would not be so medically necessary as to overcome the undue burden it established.

The State now appeals the granting of the preliminary injunction and the district court's motion granting the State's Rule 52(b) motion in part.

## II.

We review a district court's grant of a preliminary injunction for an abuse of discretion.  *Janvey v. Alguire*, 647 F.3d 585, 591–92 (5th Cir. 2011).  "Although the district court may employ informal procedures and rely on

generally inadmissible evidence, the record must nevertheless support the district court's decision." *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993). In examining the record, we review a district court's findings of fact for clear error and its conclusions of law of de novo. *Planned Parenthood Ass'n of Hidalgo Cnty. Tex., Inc. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012).

To support the "extraordinary equitable remedy" of a preliminary injunction, the plaintiff must establish four elements: "(1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest." *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998).

The State argues principally that the district court erred in holding that JWHO had established a substantial likelihood of success on the merits. In this respect, the State questions one finding of fact and two conclusions of law of the district court's order. We begin by touching on the factual issue before moving to the legal arguments.

### III.

The district court found that the effect of the law would be to close the Clinic—the only licensed clinic in Mississippi. The State now contends that the district court erred because this fact is disputed, arguing that implementation of the law would not force the Clinic to close.

But we need not tarry long here because the State has waived this argument. All indications from the record are that this issue ultimately was not contested in the district court. *See Pluet v. Frasier*, 355 F.3d 381, 385 (5th Cir. 2004) ("We will not disturb the district court's judgment based upon an argument presented for the first time on appeal."). The State did not present

this argument in its response motion in opposition to JWHO's motion for preliminary injunction, and the district court noted that "the State has essentially confirmed that it will revoke the Clinic's license." Additionally, this argument is nowhere to be found in the State's opening brief; it is only in its reply brief that the State "disputes that it is a 'foregone conclusion' that enforcement of the admitting privileges requirement will close the Clinic." *See Edwards v. Johnson*, 209 F.3d 772, 775 n.1 (5th Cir. 2000) ("[Plaintiff] does not argue in his initial brief on appeal that the district court erred in adopting the magistrate's finding . . . . Therefore, any challenge to these findings has been abandoned on appeal."). Moreover, in its opening brief, the State admits that "if enforced, the admitting privileges requirement would likely require JWHO, the only currently licensed abortion facility in Mississippi, to lose its license." The State's attempt to walk back this statement in the reply brief is too little, too late.[4]

## IV.

We now take up the State's legal arguments that JWHO failed to demonstrate a substantial likelihood of success on the merits of its case. It is important to note at the outset that JWHO does not seek to have the Act declared unconstitutional for all intents and purposes; JWHO brings only an as-applied challenge to the Act. Consequently, to establish a substantial

---

[4] The dissent also argues that H.B. 1390 will not have the effect of closing the Clinic because the closure is actually caused by the actions of private parties—the private hospitals that denied the admitting privileges applications. *See Post* at 1–4. We have no occasion to consider this argument as it too has been waived. As discussed above, the State's opening brief accepts that the Act will force the closure of the Clinic. And to the extent the State has challenged the factual findings of the district court, except with regards to the rational basis issue, the State only provides conclusory challenges without any argument, so these challenges are also waived. *See Kohler v. Englade*, 470 F.3d 1104, 1114 (5th Cir. 2006) (holding that plaintiff failed to adequately brief an issue where "he failed to cite any legal authority for the proposition"); *see also* Fed. R. App. P. 28(a)(8)(A) (requiring that appellant's brief contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies").

No. 13-60599

likelihood of success on the merits, JWHO must demonstrate that H.B. 1390, as applied against JWHO in this case on these facts, likely violates the Constitution.

It is also important to keep in mind that for more than forty years, it has been settled constitutional law that the Fourteenth Amendment protects a woman's basic right to choose an abortion. *Roe v. Wade*, 410 U.S. 113, 153 (1973). Beyond this basic premise, however, the controversy seems to have no end as this basic right comes with layers of limitations. Accordingly, a woman's right to an abortion can be regulated by a state consistent with that state's interest in protecting potential life and the health of the mother. *Planned Parenthood of S.E. Penn. v. Casey*, 505 U.S. 833, 846 (1992) (plurality opinion) (reaffirming the state's "legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child"). The Supreme Court has held, however, that such state regulations may not impose an "undue burden" on the basic right to terminate a pregnancy by abortion prior to the fetus's viability. *Id*. at 895 ("[The challenged regulation] is an undue burden, and therefore invalid."); *see also id*. at 877 ("[A] statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends."). A law fails this standard, and is thus unconstitutional, "if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Gonzales v. Carhart*, 550 U.S. 124, 156 (2007) (quoting *Casey*, 505 U.S. at 878). Laws that merely have "the incidental effect of making it more difficult or more expensive to procure an abortion" do not impose an undue burden and are thus constitutional. *Casey*, 505 U.S. at 874. In addition to creating no undue burden, an abortion restriction must pass a rational basis test. *Gonzales*, 550

8

U.S. at 158 ("Where it has a rational basis to act, *and* it does not impose an undue burden, the State may use its regulatory power to bar certain procedures and substitute others, all in furtherance of its legitimate interest in regulating the medical profession in order to promote respect for life, including life of the unborn." (emphasis added)).

In addition to these Supreme Court precedents, we are guided by a recent opinion of our court determining the constitutionality of a similar Texas statute. *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583 (5th Cir. 2014). In *Abbott*, we discussed the constitutionality of a Texas law that, among other things, required that a physician performing an abortion have admitting privileges at a hospital located within thirty miles of the site of the abortion. *Id.* at 587. We held that this requirement satisfied rational basis review. *Id.* at 594–95. We additionally held that the law did not impose an undue burden on a woman's right to an abortion because "an increase of travel of less than 150 miles for some women is not an undue burden under *Casey*." *Id.* at 598.

With these precedents establishing the parameters of our inquiry today, we turn to the State's two principal arguments for reversing the district court. First, the State argues that the district court erred in failing to undertake a rational basis review of the Act, a review that must acknowledge that there is indeed a rational interest of the State in protecting the health of its citizens. Second, the State argues that the district court erred in holding that the Act imposed an undue burden on a woman's right to an abortion because Mississippi women could travel to adjoining states to obtain an abortion. We will discuss the rational basis of the Act first.

## A.

In issuing the preliminary injunction, the district court saw the rational basis and no-undue-burden requirements as independent of each other, and

both had to be satisfied in order for the Act to survive; that is, a regulation of the constitutional right must be struck if it fails to meet either test. Consequently, once the district court had held that the law created an undue burden on the exercise of the constitutional right, it became superfluous, the district court concluded, to engage in the rational basis inquiry.  Conversely, the State argues that the rational basis inquiry is a necessary part of the total analysis, and it cannot be divorced from the undue burden analysis; this is especially true because the rational basis for the law will inform whether any burden on the right to an abortion is "undue."  We hold that we do not need to decide this dispute because, assuming that a rational basis review is a necessary first step, our court in *Abbott* has addressed the rational basis of a virtually identical law, and we are bound by that precedent to accept that the Mississippi statute has a rational basis.[5]

In *Abbott*, we recognized that in determining whether a law is rational, the scales are tipped in a state's favor. *Id.* at 594 ("[C]ourts must presume that the law in question is valid and sustain it so long as the law is rationally related to a legitimate state interest.").  A law meets this standard if it is "based on rational speculation" even if that speculation is unsupported by evidence or empirical data. *Id.*  We thus held that the Texas regulation satisfied a rational basis review because it was based on the rational speculation that it would "assist in preventing patient abandonment" by the doctor providing the abortion. *Id.* at 594–95.  We see no basis for distinguishing the rational basis analysis of H.B. 1390.  None of the rationales discussed in *Abbott* was state specific, and each would be equally applicable to H.B. 1390.

---

[5] The Texas law at issue in *Abbott* and H.B. 1390 are substantively identical.  Both require that the doctor performing an abortion hold admitting privileges at a nearby hospital. *See Abbott*, 748 F.3d at 587 (explaining that Texas regulation "requires that a physician performing or inducing an abortion have admitting privileges . . . at a hospital no more than thirty miles from the location where the abortion is provided").

No. 13-60599

Accordingly, we hold that H.B. 1390 satisfies rational basis review based upon our binding precedent in *Abbott*. We now turn to the thornier question: whether JWHO has demonstrated a substantial likelihood of proving that the law imposes an undue burden on the right to choose an abortion. *Gonzales*, 550 U.S. at 158 (requiring that an abortion regulation satisfy rational basis review *and* not impose an undue burden).

## B.

A law imposes an undue burden on the right to an abortion when the law "has the purpose or effect of creating a 'substantial obstacle' to a woman's choice." *Abbott*, 748 F.3d at 590 (citing *Casey*, 505 U.S. at 874, 878). The district court did not reach the purpose inquiry, and the parties do not address it. We will therefore limit our discussion to the Act's effects.

### 1.

Assuming that the Clinic will close, the State argues that this result still would not create an undue burden. The State argues that, at most, an incidental burden will be created as Mississippi women will only be required to travel a further distance to reach an abortion clinic. The State points to clinics in cities in neighboring states such as Baton Rouge, New Orleans, and Memphis. Relying on these neighboring clinics, the State argues that *Abbott* demands reversal in this case because of the nearby clinics, albeit in other states.

JWHO does not argue that the distances involved alone impose an undue burden. Nor could it in the light of *Abbott*. *See id.* at 598 ("We therefore conclude that *Casey* counsels against striking down a statute solely because women may have to travel long distances to obtain abortions."). We thus accept that, if these out-of-state clinics are properly considered in the undue burden analysis, the Act may well be upheld. This question is a central issue upon which the parties disagree: In analyzing whether the Act imposes an undue

11

burden, should the analysis focus only on the availability of abortions in Mississippi, or should it also take into account nearby clinics in neighboring states. We turn now to this dispute.[6]

2.

The district court held that because H.B. 1390 would close the only abortion clinic in Mississippi, women in Mississippi would be forced to travel to a neighboring state for an abortion, which, according to the district court, creates an undue burden notwithstanding that the physical distances may not be unduly burdensome. The district court reasoned that accepting the State's argument would result in "a patchwork system where constitutional rights are available in some states but not in others." The district court also found support in a prior case decided in the same district court—*Jackson Women's Health Org., Inc. v. Amy*, 330 F. Supp. 2d 820 (S.D. Miss. 2004)—and a vacated Fifth Circuit decision—*Okpalobi v. Foster*, 190 F.3d 337 (5th Cir. 1999), *superseded on reh'g en banc on other grounds*, 244 F.3d 405 (5th Cir. 2001). The district court held that these two decisions, combined with the practical considerations, demonstrated that closing the only abortion clinic in Mississippi would impose an undue burden on the constitutional right.

The State attacks the district court's conclusion by pointing out that there is no reason that traveling a given distance is made more burdensome by simply crossing a state line during the trip. Crossing a state line, it argues, does not increase the time or money required for a trip of a given length. Thus,

---

[6] *Abbott* does not speak to this issue. Even if the admitting privileges requirement in *Abbott* were enforced, a number of clinics would remain open in Texas. *Abbott*, 748 F.3d at 598 ("Although some clinics may be required to shut their doors, there is no showing whatsoever that *any* woman will lack reasonable access to a clinic within Texas. All of the major Texas cities, including Austin, Corpus Christi, Dallas, El Paso, Houston, and San Antonio, continue to have multiple clinics where many physicians will have or obtain hospital admitting privileges." (emphasis in original)).

No. 13-60599

for the State, reasonable travel distances to other states' facilities should end further discussion.

JWHO supports the district court's conclusion that state lines do matter by pointing out that courts do not look to the availability of abortions in neighboring states to determine whether a regulation imposed an undue burden. For instance, in *Casey*, the Supreme Court did not consider the availability of abortions in states surrounding Pennsylvania in invalidating the spousal notification law. The Court held that the law was likely to impose an undue burden because a "significant number of women . . . are likely to be deterred from procuring an abortion as surely as if [Pennsylvania] had outlawed abortion in all cases." *Casey*, 505 U.S. at 893–94. The Court found it significant that the regulation mirrored the effect of a law outlawing abortion *in Pennsylvania*. The Court did not mention or consider the potential availability of abortions without spousal notification in surrounding states.

Similarly, in *Jane L. v. Bangerter*, the Tenth Circuit considered the constitutionality of a Utah law that significantly restricted abortions after twenty weeks gestation. 102 F.3d 1112, 1114 (10th Cir. 1996), *cert denied*, 520 U.S. 1274 (1997). The district court in the case held that the restriction did not impose an undue burden on a woman's right to choose an abortion because the record did not contain evidence that any woman had wanted or attempted to obtain an abortion after twenty weeks gestation. *Id.* at 1117. Reversing the district court, the Tenth Circuit cited a declaration by the director of a Utah abortion clinic stating that in "the Clinic routinely refers to another state those Utah residents needing an abortion after twenty weeks," and that in 1990 "the Clinic referred out of state ten to fifteen women who needed such abortions." *Id.* In view of this fact, the court did *not* engage in any further analysis of the travel time and costs to women who were required to travel to those out of state clinics. *Id.* Instead, the panel moved directly to conclude that "a group of

13

No. 13-60599

women exists in Utah for whom [the statute] actually operates as an impermissible ban on the right to abort a nonviable fetus." *Id.* at 1117–18. The panel found dispositive that women were forced to leave the state to exercise their constitutional right.

*Jane L.* stands out as the clearest example of an appeals court focusing its analysis on a regulation's effect within the regulating state. We also note, however, that other courts, in striking down abortion regulations, have failed to consider the availability of abortions in neighboring states. *See, e.g.*, *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 200–10 (6th Cir. 1997) (invalidating Ohio abortion regulations because they imposed an undue burden on the right to an abortion without discussion of availability in neighboring states).[7] These cases strongly suggest that courts have limited the undue burden analysis to the burden imposed within the state.[8]

3.

JWHO's position finds additional support in *State of Missouri ex rel. Gaines v. Canada*, 305 U.S. 337 (1938). In *Gaines*, the University of Missouri's law school denied Gaines admission because he was African-American. *Id.* at 342. In denying admission to its law school, the state advised Gaines that he

---

[7] A panel of this court embraced a similar theory in *Okpalobi*. The panel in *Okpalobi* held that a Louisiana statute imposed an undue burden because "[a] measure that has the effect of forcing all or a substantial portion of a state's abortion providers to stop offering such procedures creates a substantial obstacle to a woman's right to have a pre-viability abortion, thus constituting an undue burden under *Casey*." *Okpalobi*, 190 F.3d at 357. The panel opinion in *Okpalobi* was later vacated on jurisdictional grounds. *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) (en banc).

[8] These authorities are supported by the practical effects that would follow from the State's proposed rule. It would be exceedingly difficult for courts to engage in an as-applied analysis of an abortion restriction if we were required to consider not only the effect on abortion clinics in the regulating state, but also the law, potential changes in the law, and locations of abortion clinics in neighboring states. This concern is not farfetched. Both Alabama and Louisiana have passed similar admitting privileges regulations for abortion providers, which could lead to the closure of clinics in those states.

could take advantage of Missouri's statutory scheme through which the University of Missouri board of curators would provide him, as an African-American Missouri resident, a tuition stipend for use at a law school in an adjacent state. *Id.* at 342–43. Gaines rejected this offer and sought a writ of mandamus to compel the University of Missouri to grant him admission, which the Missouri Supreme Court denied. *Id.* at 342.

The Supreme Court of the United States reversed, holding that Missouri's tuition stipend program could not relieve the State of Missouri of its obligations to its citizens under the Fourteenth Amendment. In a passage worth quoting at length, the Court reasoned that:

> [T]he obligation of the State to give the protection of equal laws can be performed only where its laws operate, that is, within its own jurisdiction. . . . That obligation is imposed by the Constitution upon the States severally as governmental entities, —each responsible for its own laws establishing the rights and duties of persons within its borders. It is an obligation the burden of which cannot be cast by one State upon another, and no State can be excused from performance by what another State may do or fail to do. That separate responsibility of each State within its own sphere is of the essence of statehood maintained under our dual system.

*Id.* at 350.

To be sure, there are distinctions between *Gaines* and the instant case, which the State points out. First, *Gaines* was an Equal Protection case, which addresses the discriminatory distribution of a service provided by the state government; and second, *Gaines* has never been cited in the abortion context. In contrast, this appeal addresses rights arising under the Due Process Clause, in which the state government is not providing any service. The State is only regulating a privately provided service that is protected by the United States Constitution.

No. 13-60599

Although cognizant of these serious distinctions, and although decided in a different context, we think the principle of *Gaines* resolves this appeal. *Gaines* simply and plainly holds that a state cannot lean on its sovereign neighbors to provide protection of its citizens' federal constitutional rights, a principle that obviously has trenchant relevance here. Pre-viability, a woman has the constitutional right to end her pregnancy by abortion. H.B. 1390 effectively extinguishes that right within Mississippi's borders. *Gaines* locks the gate for Mississippi to escape to another state's protective umbrella and thus requires us to conduct the undue burden inquiry by looking only at the ability of Mississippi women to exercise their right within Mississippi's borders. There is no hiding the relevant language in *Gaines*: "[N]o State can be excused from performance by what another state may do or fail to do." *Id.*

Consistent with *Gaines*, we hold that the proper formulation of the undue burden analysis focuses solely on the effects within the regulating state—here, Mississippi. Under this formulation, JWHO has demonstrated a substantial likelihood of proving that H.B. 1390—effectively closing the one abortion clinic in the state—has the effect of placing a substantial obstacle in the path of a woman seeking an abortion in Mississippi, and is therefore unconstitutional as applied to the plaintiffs in this case.[9]

V.

Having reached this conclusion, we close with two observations. First, the State argues that our analysis bars the State from enforcing any regulation against JWHO that would close the Clinic simply because it is the only clinic in Mississippi. For instance, the State argues that our opinion would preclude

---

[9] Consistent with this holding, we also hold that the district court did not abuse its discretion in finding that the injunction would not disserve the public interest because it will prevent constitutional deprivations. *See, e.g.*, *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").

16

the State from closing the Clinic for sanitation violations because, like H.B. 1390, such action would impose an undue burden on the right to an abortion by closing the only clinic in Mississippi.

Nothing in this opinion should be read to hold that any law or regulation that has the effect of closing all abortion clinics in a state would inevitably fail the undue burden analysis. Whether the State's hypothetical sanitation regulation would impose an undue burden is not a question before this court, and is not a question that can be answered without reference to the factual context in which the regulation arose and operates. Here, we hold only that JWHO has demonstrated a substantial likelihood of proving that H.B. 1390, on this record and as applied to the plaintiffs in this case, imposes an undue burden on a woman's right to choose an abortion. In reaching this determination, we look to the entire record and factual context in which the law operates, including, but not limited to, the statutory provision in question, the Clinic's status as the sole abortion clinic in Mississippi, the ability of the Clinic to comply with H.B. 1390, Dr. Parker's and Dr. Doe's efforts to obtain admitting privileges, the reasons cited by the hospitals for denying admitting privileges to Dr. Parker and Dr. Doe, the absence of a Mississippi law prohibiting hospitals from discriminating against physicians who perform abortions when granting admitting privileges, and the nature and process of the admitting-privileges determination. *See Casey,* 505 U.S. at 887-95 (looking to factual context in striking down Pennsylvania's spousal notification provision).

Finally, this case is an as-applied challenge to H.B. 1390. The district court's judgment granting the preliminary injunction enjoined "any and all forms of enforcement of the Admitting Privileges Requirement of the Act during the pendency of this litigation." To the extent that this language extends the preliminary injunction to actions by the State against parties other

than JWHO and the other plaintiffs, it was an overly broad remedy in an as-applied challenge. We modify the preliminary injunction to enjoin the State from enforcing the admitting privileges provision of H.B. 1390 against the plaintiffs in this case.

## VI.

In this opinion we hold that, assuming a rational basis inquiry is a necessary first step in deciding the constitutionality of an abortion regulation, H.B. 1390 satisfies rational basis review. We hold that *Gaines* instructs us to consider the effects of H.B. 1390 only within Mississippi in conducting an undue burden analysis. As a result, we hold that JWHO has demonstrated a substantial likelihood of success on its claim that H.B. 1390's admission-privileges requirement imposes an undue burden on a woman's right to choose an abortion in Mississippi, and is therefore unconstitutional as applied to the plaintiffs in this case. Finally, we hold that, to the extent the district court's preliminary injunction enjoined enforcement of H.B. 1390 against parties other than the plaintiffs in this case, it was overly broad and is modified to apply only to the parties in this case. Accordingly, the judgment of the district court granting the preliminary injunction is

AFFIRMED as modified.

No. 13-60599

EMILIO M. GARZA, Circuit Judge, dissenting:

The majority holds that the mere act of crossing a state border imposes an "undue burden" on a woman's right to choose to obtain abortion services. *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 878 (1992). Because the undue burden test requires an assessment of the difficulty of obtaining abortion services, whether in a woman's own state or a neighboring state, and because neither the district court nor the majority has undertaken this assessment, I respectfully dissent.

**A**

The majority claims that "the district court found that the *effect* of the law would be to close the Clinic" operated by the Jackson Women's Health Organization ("JWHO"). *Ante* at 6 (emphasis added).[1]

The direct, legal effect of House Bill 1390 ("H.B. 1390" or "the Act") is only to mandate that "[a]ll physicians associated with [an] abortion facility must have admitting privileges at a local hospital . . . ." Miss. Code Ann. § 41-75-1(f). Mississippi had previously required all doctors affiliated with outpatient ambulatory surgical facilities to have admitting privileges at a local hospital, but expressly exempted Level I abortion facilities, which are authorized to perform abortions after the first trimester. *See* Miss. Admin.

---

[1] Preliminarily, the district court made no such finding. The district court found only that "the State has essentially confirmed that it will revoke the Clinic's license . . . ." The undisputed fact that the Clinic's closure was imminent, *see ante* Part III, says nothing about the legal cause of such closure. Even if the district court implicitly found that House Bill 1390 would cause the Clinic's closure, the majority errs in relying on this finding because it is not supported by this record, notwithstanding any concerns about waiver, *ante* at 7 n.4. *See Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) ("[T]he reviewing court may assume that the [lower] court impliedly made a finding consistent with its general holding so long as the implied finding is *supported by the evidence*." (emphasis added)).

No. 13-60599

Code 15-16-1:42.9.7 (2011). H.B. 1390 eliminated this exemption.[2] Because the Clinic is a Level I abortion facility, all of its doctors must obtain admitting privileges under the Act. Critically, however, the Act neither directly closes the Clinic, prevents the Clinic's physicians from obtaining admitting privileges, nor authorizes the State to intervene in the hospitals' decision-making.[3]

Moreover, the Act, as the majority correctly holds, is amply supported by a rational basis. *Ante* Part IV.A. In ascertaining whether "any conceivable rationale" underlies a law, we are compelled to judge the words of the statute, not the motives of those who passed it. *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 594 (5th Cir. 2014). Such a rational basis is plainly present: The admitting-privileges requirement both strengthens regulation of the medical profession and protects maternal health. *See Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) ("[T]he State has a significant role to play in regulating the medical profession."); *Casey*, 505 U.S. at 846 (explaining states' "legitimate interes[t] from the outset of the pregnancy in protecting the health of the woman"). In sum, the purpose of H.B. 1390 is to protect women seeking abortion services from the known risks of complications.[4]

---

[2] JWHO does not challenge the admitting-privileges requirement on procedural due process grounds, and in any event, *Abbott* has foreclosed such an argument. *See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 600 (5th Cir. 2014) (citing *Women's Health Ctr. of West Cnty., Inc. v. Webster*, 871 F.2d 1377, 1382 (8th Cir. 1989)).

[3] Also unchanged by H.B. 1390 is the authority of hospital officials to "evaluate the professional competence of . . . applicants for medical staff membership and/or clinical privileges." Miss. Admin. Code 15-16-1:41.6.6.

[4] The *Abbott* panel concluded that *Casey*'s "purpose" prong remains an independent inquiry, and we are bound by that prior panel's decision. *See Abbott*, 748 F.3d at 590 ("In *Gonzales*, the Court *added* that abortion restrictions *must also* pass rational basis review." (emphasis added)); *ante* at 8 (explaining that rational basis review functions as a third inquiry "in addition" to *Casey*'s two-part test of whether the challenged law has a purpose or effect of imposing an undue burden). However, in my view, *Gonzales v. Carhart* re-stated

No. 13-60599

The independent decisions of private hospitals have no place in our review of state action under the Constitution. *Cf. Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982) (articulating state-action requirement for § 1983 suits).[5] Here, five hospitals rejected the JWHO doctors' applications out of hand because they performed elective abortions. As the majority notes, each of these five hospitals issued letters explaining that "[t]he nature of [the applicant's] proposed medical practice is inconsistent with [the] Hospital's policies and practices as concerns abortion and, in particular, elective abortions." *See ante* at 3 n.3. Federal law, however, prohibits entities receiving certain funding or contracts from discriminating "in the extension of staff or other privileges to any physician . . . because he performed or assisted in the performance of a lawful sterilization procedure or abortion . . . ." 42 U.S.C. § 300a–7(c).[6] Thus, when a state affords private hospitals the authority to grant

---

*Casey*'s purpose inquiry as rational basis review. *See Gonzales*, 550 U.S. at 156–60 (concluding that purpose of ban on particular abortion method was not to impose an undue burden on abortion right because state has "a rational basis to act"). Thus, after *Gonzales*, the undue burden test consists of two (and not three) inquiries—whether the challenged law has a rational basis and whether it has the effect of imposing an undue burden on the abortion right. *See Planned Parenthood of Wis. v. Van Hollen*, 738 F.3d 786, 799 (7th Cir. 2013) (Manion, J., concurring in part and in the judgment) (stating "two-part test").

[5] Under *Lugar*'s two-part test for determining whether a deprivation of a federal right is fairly attributable to the state, (1) "the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible"; and (2) "the party charged with the deprivation must be a person who may fairly be said to be a state actor," and "[t]his may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." *Ballard v. Wall*, 413 F.3d 510, 518 (5th Cir. 2005) (quoting *Lugar*, 457 U.S. at 937).

[6] By contrast, Mississippi law protects only physicians who choose *not* to perform abortions, not those who do. *See* Miss. Code Ann. § 41-107-7(3) ("It shall be unlawful for any person, public or private institution, or public official to discriminate against any health care institution, or any person, association, corporation, or other entity . . . in any manner, including . . . any denial . . . [of] staff privileges . . . because such health care institution, or person, association, or corporation . . . *declines to participate in a health care service* which violates the health care institution's conscience." (emphasis added)).

21

No. 13-60599

admitting privileges, those hospitals must faithfully exercise their authority in a non-discriminatory manner.[7]

Regardless of the propriety or the legality of the hospitals' actions, what matters for this substantive due process analysis is that JWHO has not shown that the Clinic's closure would result directly from H.B. 1390, as opposed to the independent decisions of local hospitals—non-state actors. Because JWHO failed to demonstrate that the Act could have "the *effect* of placing a substantial obstacle in the path of a woman's choice" to obtain abortion services, *Casey*, 505 U.S. at 877 (emphasis added), it has not shown a substantial likelihood that it will prevail on the merits.

**B**

Even assuming that H.B. 1390 itself would cause the Clinic to close, I would still disagree with the majority's holding. The majority, following the lower court, holds that "the proper formulation of the undue burden analysis focuses solely on the [challenged law's] effects within the regulating state." *Ante* at 16. Accordingly, the majority concludes that H.B. 1390, which "effectively clos[es] the one abortion clinic in the state," would impose an undue burden because Mississippi women would need to travel to a neighboring state to obtain abortion services. *Id.* Put differently, in the majority's view, to

---

[7] The Second Circuit has held that this statutory provision does not imply a private right of action. *See Cenzon-DeCarlo v. Mount Sinai Hosp.*, 626 F.3d 695, 698–99 (2d Cir. 2010). However, if the hospitals are indeed entities covered under 42 U.S.C. § 300a–7(c), JWHO would likely have a remedy under 42 U.S.C. § 1983 for a violation of its statutory right to be free from discrimination in seeking admitting privileges. *See Maine v. Thiboutot*, 448 U.S. 1, 4 (1980) (holding that because § 1983 by its plain text "broadly encompasses violations of federal statutory as well as constitutional law," plaintiffs could bring suit for violation of Social Security Act); *Banks v. Dallas Hous. Auth.*, 271 F.3d 605, 609 (5th Cir. 2001) (explaining that § 1983 suits alleging violation of federal statute must be for "violation of a federal *right*, not merely a violation of federal *law*" and applying three-factor test for determining existence of "right" (quoting *Blessing v. Freestone*, 520 U.S. 329, 340–41 (1997))).

require a woman to cross a state border in order to obtain abortion services would unduly burden her right to choose an abortion. I disagree.

Two errors infect the majority's analysis—an impermissible reliance on silence and a misunderstanding of the holding of *State of Missouri ex rel. Gaines v. Canada*, 305 U.S. 337 (1938). In the majority's view, the *Casey* Court's failure to "mention or consider the potential availability of abortions . . . in surrounding states" implies that we must confine our undue burden analysis to Mississippi. *Ante* at 13.[8] Such an inference is legally nonsensical: No such rule exists. *Casey* dealt with the constitutionality of a Pennsylvania statute imposing various informed consent and spousal notification requirements on women seeking abortion services in that state, and the Court had no occasion to consider abortion access in nearby states. *See Casey*, 505 U.S. at 879–901. The lack of a squarely applicable precedent means only that the question remains open. "In constitutional adjudication, as in the common law, rules of law often develop incrementally as earlier decisions are applied to new factual situations." *Williams v. Taylor*, 529 U.S. 362, 384–85 (2000). Here, we are called upon to apply substantive due process principles to a novel factual situation—the closure of a state's sole abortion provider as a result of a law regulating physician qualifications. The absence of binding authority addressing similar facts merely frees us to derive the rule of law that resolves this dispute.[9]

---

[8] *See also ante* at 14 (explaining that "other courts, in striking down abortion regulations, have failed to consider the availability of abortions in neighboring states").

[9] The majority discusses certain language in *Okpalobi v. Foster*, 190 F.3d 337 (5th Cir. 1999), suggesting that a law's closure of all of a state's abortion providers would constitute an undue burden. But as the majority acknowledges (and as the district court, too, recognized), that panel opinion was later vacated in its entirety by the *en banc* court for lack of Article III jurisdiction and is therefore not binding precedent. *See ante* at 14 n.7 (citing *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) (en banc)). Similarly, to the extent that the Tenth Circuit decision in *Jane L. v. Bangerter*, 102 F.3d 1112 (10th Cir. 1996), stands for the proposition that causing women to leave the state to obtain abortion services imposes an

No. 13-60599

Of course, we do not write on a blank slate. *Casey* teaches that a state may regulate abortion to further its interests in protecting the health and safety of women, though "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." *Casey*, 505 U.S. at 878. Moreover, "[t]he fact that a law which serves a valid purpose . . . has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it." *Id.* at 874. Applying *Casey*, a panel of this Court recently concluded that "an increase of travel of less than 150 miles for some women is not an undue burden . . . ." *Abbott*, 748 F.3d at 598. The majority gives these binding principles a passing nod, *ante* at 8–9, before setting them aside for the sole reason that this case happens to involve the crossing of state borders to obtain abortion services, *id.* at 12 n.6.

The majority's second, and more grievous, error is its reliance on the wholly inapposite case of *Gaines*. In that equal protection case, Gaines was refused admission to the University of Missouri's law school because he was African-American. *Gaines*, 305 U.S. at 343. Missouri's statutory scheme would have provided Gaines a stipend to attend law school in a neighboring state. Rather than apply for the stipend, Gaines filed a petition for a writ of mandamus to compel the University to admit him, on the grounds that his rejection was "a denial by the State of the equal protection of the laws in violation of the Fourteenth Amendment . . . ." *Id.* at 342. The state court denied his petition, and the Supreme Court of Missouri affirmed. *Id.* The Supreme Court of the United States reversed, holding that the Equal Protection Clause required Missouri, which had already established a law

undue burden, *see ante* at 13–14, that decision does not bind us, and I find it unpersuasive for the reasons explained below.

24

school, to "furnish [Gaines] within its borders facilities for legal education substantially equal to those which the State there afforded for persons of the white race . . . ." *Id.* at 351.

That a state may not shift its equal protection duties to another state is "[m]anifestly" clear. *Id.* at 350. The text of the Equal Protection Clause requires that "[n]o state shall . . . deny to any person *within its jurisdiction* the equal protection of the laws." U.S. Const. amend. XIV (emphasis added). As the *Gaines* Court explained, the reason for this jurisdictional qualification is elementary: A state's duty to give equal protection of the laws "can be performed only where its laws operate, that is, within its own jurisdiction." *Gaines*, 305 U.S. at 350. The "separate responsibility" to provide equal protection falls upon each and every state "within its own sphere," for the power of each state's laws extends no farther. *Id.*

Although the correctness of *Gaines*'s equal protection holding is beyond question, it has no bearing on this case, which arises under the Due Process Clause. The majority concedes that "*Gaines* has never been cited in the abortion context." *Ante* at 15. Nonetheless, the majority proceeds to transpose *Gaines*'s maxim that "[n]o State can be excused from performance by what another State may do or fail to do," *Gaines*, 305 U.S. at 350, into a broader principle that "a state cannot lean on its sovereign neighbors to provide protection of its citizens' federal constitutional rights," thereby concluding that "H.B. 1390 effectively extinguishes [the abortion] right within Mississippi's borders," *ante* at 16. The majority misreads *Gaines*. A state's obligation "*to give the protection of equal laws*" does not depend on "what another State may do or fail to do." *Gaines*, 305 U.S. at 350 (emphasis added). *Gaines* thus governs each state's obligations solely under the Equal Protection Clause, not under the Constitution at large, much less the substantive component of the Due Process Clause. *See Ayers v. Thompson*, 358 F.3d 356, 360 (5th Cir. 2004)

No. 13-60599

(applying *Gaines*'s holding that "the Fourteenth Amendment guarantees to individuals the *equal protection of the laws*" (emphasis added)).

Additionally, the state's equal protection obligation is fundamentally different from its obligation under *Casey*. The majority concedes that in the abortion context, "the state government is not providing any [abortion] service," *ante* at 15, but fails to grasp the doctrinal consequence: The duty not to unduly burden the abortion right could *never* be "cast by one State upon another," *Gaines*, 305 U.S. at 350, because this duty does not require a state to *take* any action, but rather to *refrain* from taking unconstitutional actions. Under the Equal Protection Clause, a state must provide equal protection of the laws whenever and wherever it enforces or provides a service under its laws. In *Gaines*, Missouri had to provide equal protection of its laws to Gaines in Missouri, where it had elected to offer a law school education to white students. To require Gaines to attend law school in another state would indeed cause the equal protection duty to be "cast by one State upon another." *Gaines*, 305 U.S. at 350. By contrast, no state is obligated to provide or guarantee the provision of abortion services within its borders.[10] Rather, a state need only "regulat[e] [the] privately provided service" of abortion in accordance with the Due Process Clause, *ante* at 15, ensuring that its rational laws do not impose an undue burden. *See Casey*, 505 U.S. at 878; *Gonzales*, 550 U.S. at 158. Mississippi owes this duty to its female residents whether the Clinic is open or not. Absent any evidence and factual findings on the Act's impact on costs and travel distances for accessing abortion services, JWHO has failed to demonstrate a substantial likelihood of proving a constitutional violation.

---

[10] *See Casey*, 505 U.S. at 887 ("Even the broadest reading of *Roe*, however, has not suggested that there is a constitutional right to abortion on demand. Rather, the right protected by *Roe* is a right to decide to terminate a pregnancy free of undue interference by the State." (citation omitted)).

No. 13-60599

The inapplicability of *Gaines* is even more apparent in light of the text of the Due Process Clause. If all states are required to refrain from unduly burdening the abortion right of "any person," Casey, 505 U.S. at 846 (quoting U.S. Const. amend. XIV), then it is impossible for this obligation to be "cast by one State upon another," *Gaines*, 305 U.S. at 350. Here, Mississippi could not possibly "shift its obligation" under the Due Process Clause, *ante* at 2, because its neighboring states (and all other states) *already* owe the same due process obligation to "any person"—including Mississippi women.

The majority's cited authorities do not resolve this case. *Casey* did not contemplate whether the availability of abortion in neighboring states affects the undue burden analysis. Similarly, *Gaines* stands for the uncontroversial principle that a state's duty to provide equal protection cannot be altered by the actions or inactions of a neighboring state. The majority sheds no light on a state's duties under the Due Process Clause, let alone its duty to refrain from unduly burdening the right to choose an abortion.

A correct analysis under the Due Process Clause requires us to apply *Casey* and *Abbott* and consider whether the difficulty of obtaining abortion services under the facts of this case constitutes an undue burden. On this record, JWHO has not shown a substantial likelihood that any such burden actually exists—that the Act results in more than an "incidental effect of making it more difficult or more expensive to procure an abortion." *Casey*, 505 U.S. at 874. In 2011, prior to the Act's passage, nearly sixty percent of Mississippi women who obtained abortions already traveled to other states for those services.[11] Thus, the Act would likely not impose any undue burden on their access to those very same out-of-state providers. As for women in the

---

[11] Mississippi State Department of Health statistics show that in 2011, Mississippi women obtained 3,188 abortions in other states and only 2,224 abortions in Mississippi. *See* Defs.' Resp. Opp'n Pls.' Second Mot. Prelim. Inj. at 24 n.27.

27

Jackson area, who would be most affected by the Clinic's closure, a proper undue burden analysis must assess the costs of obtaining abortion services at the closest facility in a neighboring state. As the district court did not conduct this analysis, the question of the permissible costs or travel distance under the substantive component of the Due Process Clause is not before us on this appeal. In any event, to support its request for a preliminary injunction, JWHO had to show a substantial likelihood that these travel costs would constitute an undue burden, and it has failed to do so.[12]

The majority claims that requiring courts to examine abortion availability in other states would be "exceedingly difficult" as a practical matter. *Ante* at 14 n.8. The majority cannot imagine how courts undertaking as-applied analyses could account for "the law, potential changes in the law, and locations of abortion clinics in neighboring states." *Id.* This concern is unfounded. Here, the parties are fully prepared and able to develop the record concerning the presence of abortion providers in neighboring states.[13] Although the majority suggests that access to these providers might change in the future, the essence of adjudication is the application of law to a set of facts at a particular point in time, regardless of how those facts might later be altered.[14] And to the extent that neighboring states' abortion laws would be

---

[12] The district court did not make findings on the distance that Mississippi women would need to travel or costs they would incur to obtain an abortion in a neighboring state following the Clinic's potential closure; instead, the district court concluded, as the majority does as well, that the closure of a state's only abortion provider would be a *per se* undue burden.

[13] The State has already submitted data on distances from Jackson to abortion facilities in West Monroe, Louisiana (121 miles); Tuscaloosa, Alabama (185 miles); Baton Rouge, Louisiana (174 miles); and Memphis, Tennessee (209 miles). *See* Defs.' Resp. Opp'n Pls.' Second Mot. Prelim. Inj. at 24 n.27.

[14] *Cf. Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 72 (1993) ("The basic rationale behind our ripeness doctrine is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements, when those disagreements are premised on contingent future events that may not occur as anticipated, or indeed may not occur at all." (internal quotation marks and citation omitted)). Furthermore, as discussed above,

relevant at all, federal courts are more than competent to survey the laws of many or even *all* states.[15]

The majority also echoes the district court's fear of a "patchwork system where constitutional rights are available in some states but not in others." *Ante* at 12. The majority's belief that the mere closure of the Clinic would abrogate the State's obligation not to unduly burden abortion access again illustrates its misunderstanding of *Gaines. See supra.* Moreover, the majority has unwittingly instituted its own "patchwork system": If all undue burden analyses must stop at state borders, the existence of an undue burden will depend, in part, on a plaintiff's location relative to those boundaries. For instance, women in northern Mississippi who live a mere fifteen miles from the heart of Memphis, Tennessee, could never enjoin the closure of the clinic in that city, lest Mississippi be "excused from [its] performance." *Gaines*, 305 U.S. at 350. But women just across the border in Tennessee could do so, if they demonstrate that the closure would impose an undue burden. This result is logically and practically untenable—all the more so in regions where populations are denser and urban areas often straddle state borders. The

---

because all states owe due process obligations to "any person," without regard to state borders, if a neighboring state is later poised to close an abortion provider upon which a Mississippi woman relies, she could sue to enjoin that closure. *See Ex parte Young*, 209 U.S. 123, 129, 149, 155–56 (1908) (holding that citizens of Iowa and Wisconsin could bring suit to enjoin Minnesota officials from enforcing state law setting railroad rates that allegedly deprived them of property without due process of law). For the same reason, there is no basis for JWHO's fear of a "domino effect," in which a state closes all in-state abortion facilities in reliance on an adjacent state's facilities, only to prompt that adjacent state to do the same in reliance on abortion availability in a third state.

[15] *See, e.g., SMI Owen Steel Co., Inc. v. Marsh USA, Inc.*, 520 F.3d 432, 437 (5th Cir. 2008) ("In making the *Erie* guess, we may consider, among other sources, treatises, decisions from other jurisdictions, and the 'majority rule.'"); *Nijhawan v. Holder*, 557 U.S. 29, 39–40 (2009) (opting to apply circumstance-specific approach to federal aggravated felony fraud provision when only eight states had fraud statutes with a monetary threshold consistent with that of the federal offense, such that categorical approach would result in "limited and . . . haphazard" application of federal statute).

majority's state-by-state undue burden analysis cannot be squared with the duty of all states to refrain from unduly burdening the right of "any person" to choose an abortion. *See Casey*, 505 U.S. at 846 (quoting U.S. Const. amend. XIV).

Lastly, the sole act of crossing a state border cannot, standing alone, constitute an unconstitutional undue burden on the abortion right because the Constitution envisions free mobility of persons without regard to state borders.[16] The majority's conceptual approach runs headlong into the well-established "constitutional right to travel from one State to another." *Saenz v. Roe*, 526 U.S. 489, 498 (1999). This right arises directly from our Constitution's goal of integrating distinct sovereigns into a single, federal polity. The Supreme Court has long "recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement." *Id.* at 499 (quoting *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969)).

By arbitrarily confining its undue burden analysis to Mississippi, the majority departs not only from the concept of a constitutional right to travel, but importantly from the text "any person" in the Due Process Clause. In assessing whether a state law unduly burdens the abortion right, courts must be able to consider the availability of abortion services in neighboring states. Accordingly, I cannot conclude, as the majority does, that our analysis must "focu[s] solely on the effects within the regulating state," *ante* at 16, or that

---

[16] *See Van Hollen*, 738 F.3d at 805 n.9 ("In our economy, crossing state lines to obtain services at a nearby urban center is common. Thus, state lines are unlikely to affect a woman's decision about where to get an abortion and the availability of abortion at out-of-state clinics should be considered in the undue burden analysis.") (Manion, J., concurring in part and in the judgment).

No. 13-60599

JWHO has shown a substantial likelihood H.B. 1390 imposes an undue burden merely by causing women to travel to an adjacent state to obtain abortion services.

The majority concludes by denying that it establishes any *per se* rule. "Nothing in this opinion," the majority declares, "should be read to hold that any law or regulation that has the effect of closing all abortion clinics in a state would inevitably fail the undue burden analysis." *Ante* at 17. Attempting to narrow its holding to the specific facts of this case, the majority claims to base its holding on "the entire record and factual context in which the law operates," including "the statutory provision in question," "the ability of the Clinic to comply with H.B. 1390," "the reasons cited by the hospitals for denying admitting privileges," and the "nature and process of the admitting-privileges determination." *Id.* In so doing, the majority professes to leave open the possibility that some law, such as the "hypothetical sanitation regulation" discussed in the State's briefing, could cause the closure of all abortion providers within a state and yet still be constitutional. *Id.* at 16–17.

The majority's attempt to cabin its holding to the facts of this case betrays its awareness that crossing Mississippi's borders cannot be dispositive. Yet notwithstanding this attempt, today's opinion concludes in no uncertain terms: "*Gaines* instructs us to consider the effects of H.B. 1390 only within Mississippi in conducting an undue burden analysis." *Id.* at 18. The majority simply cannot have it both ways. So long as the undue burden analysis is confined by Mississippi's borders, the closure of that state's sole abortion provider *must* be an undue burden.[17]

---

[17] To be sure, this case involves JWHO's as-applied challenge to H.B. 1390. But as-applied challenges still establish important rules of law, and the majority attempts to obscure the necessary implications of its own rule.

No. 13-60599

Even accepting that the majority's factors somehow narrow its holding, I find its *ad hoc* approach to be unworkable. The majority does not even attempt to explain how this case's "factual context," the "statutory provision" at issue, and the "nature and process" of the admitting-privileges requirement purportedly combine to make this burden "undue."[18] *Ante* at 17. The message for future courts and litigants is that a law causing the closure of all abortion providers in a state imposes an undue burden—unless it does *not* impose such a burden. The use of such an unprincipled approach to strike down as unconstitutional a state's exercise of its sovereign power to protect its citizens is particularly troubling.

Lastly, certain factors by which the majority purports to narrow its approach undermine its holding as to the Act's rational basis. As already explained, I fully join in the majority's conclusion that H.B. 1390 has a rational basis. *See supra* Part A; *ante* Part IV.A. Yet the majority, by faulting the "statutory provision" and the "nature and process of the admitting-privileges determination," without any explanation, in essence mounts a back-door attack on the purpose of H.B. 1390. *Ante* at 17.[19] And to the extent that the majority's litany of factors is an indictment of the local hospitals for their improper discrimination,[20] it is those hospitals—not the State or H.B. 1390— that should be held accountable. *See supra* Part A.

---

[18] Tellingly, at oral argument, when JWHO was asked to clarify how courts should assess whether the closure of a state's only abortion clinic due to a "valid regulation" constitutes an undue burden, JWHO's perfectly tautological suggestion was to apply the "undue burden" test. The majority apparently agrees.

[19] The question of whether H.B. 1390 has a purpose of imposing an undue burden (under *Abbott*, a question distinct from the rational basis inquiry, *see supra* note 4) is not before us on this appeal, and the district court made no relevant factual findings. If, in the majority's view, ascertaining the Act's purpose is indeed so crucial, then for this reason alone, vacatur is proper.

[20] The majority claims to base its holding on certain facts that seem to implicate the local hospitals' actions, including "the ability of the Clinic to comply with H.B. 1390, Dr. Parker's and Dr. Doe's efforts to obtain admitting privileges, the reasons cited by the

No. 13-60599

Despite the majority's attempt to narrow its reasoning, today's opinion can only be read to mean that a law or regulation causing all of a state's abortion providers to close, such that women must cross a state border to obtain abortion services, imposes an unconstitutional undue burden on the abortion right.

## C

The majority reminds us that "the Supreme Court long ago determined that the Constitution protects a woman's right to choose an abortion . . . ." *Ante* at 1. We are then reminded that "the right to an abortion was found in the penumbras of the Constitution . . . ." *Id.* at 2. Proceeding further, and following the Supreme Court's direction, the majority relies on *Casey* for its "undue burden" test. *Id.* at 8.[21]

In addition to announcing the undue burden standard, however, *Casey* also advanced a new interpretation of substantive due process by which the judiciary can now interpret the "full scope of the liberty guaranteed by the Due Process Clause." *Casey*, 505 U.S. at 848 (quoting *Poe v. Ullman*, 367 U.S. 497, 543 (1961) (Harlan, J., dissenting)). In taking blockquotes from Justice Harlan's dissent in *Poe v. Ullman* to explain its new theory, *see Casey*, 505 U.S. at 848–50, the *Casey* joint opinion notably omitted portions capturing the full extent of his departure from the Constitution's text:

> [T]he imperative character of Constitutional provisions . . . must be discerned from a particular provision's larger context. And inasmuch as this

---

hospitals for denying admitting privileges to Dr. Parker and Dr. Doe, [and] the absence of a Mississippi law prohibiting hospitals from discriminating against physicians who perform abortions when granting admitting privileges . . . ." *Ante* at 17.

[21] To support its theory of unenumerated substantive due process rights, the *Casey* joint opinion shifted the underlying theory from a right of privacy, *see Roe v. Wade*, 410 U.S. 113, 152–53 (1973), to a substantive due process liberty interest as originally articulated by Justice Harlan in his dissent in *Poe v. Ullman*, 367 U.S. 497, 542–43 (1961) (Harlan, J., dissenting).

> context is one not of words, but of history and purposes, the full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution.

*Poe*, 367 U.S. at 542–43 (Harlan, J., dissenting).[22]  We now follow Justice Harlan: Interpretation in this "larger context" is an enterprise "not of words, but of history and purposes."  *Id.*  Importantly, "history" and "purposes"— severed from the words of the Constitution and the explicit guarantees they provide—have either no definite meaning or, even more conveniently for some, any desired meaning whatsoever.  History, purpose, and tradition are not *legal* concepts; rather, they are elements of a new *political* lexicon.  In this, the will of the People, as expressed in their written Constitution, gives way to the political choices of the judiciary.[23]

Consistent with its substantive due process theory, *Casey* gives full play to political preferences in its "undue burden" standard.  By defining in circular fashion an "undue burden" as a "substantial obstacle," *Casey*, 505 U.S. at 878,

---

[22] In concluding, the *Casey* joint opinion likewise concedes that it is unconstrained by the niceties of constitutional text, explaining that "[e]ach generation must learn anew that the Constitution's written terms embody *ideas and aspirations* that must survive more ages than one."  *Casey*, 505 U.S. at 901 (emphasis added).  *Compare Casey*, 505 U.S. at 849 ("[A]djudication of substantive due process claims may call upon the Court . . . to exercise . . . reasoned judgment."); *id.* at 986 (describing undue burden standard as "inherently manipulable") (Scalia, J., concurring in the judgment in part and dissenting in part), *with Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803) ("That [an attempt to uphold a law notwithstanding an express constitutional prohibition] thus reduces to nothing what we have deemed the greatest improvement on political institutions—a *written constitution*—would of itself be sufficient, in America, where written constitutions have been viewed with so much reverence, for rejecting the construction." (emphasis added)); *id.* at 176 ("That *the people* have an original right to establish, for their future government, such principles as, in their opinion, shall most conduce to their own happiness, is the basis, on which the whole American fabric has been erected." (emphasis added)).

[23] "The absolute is not attained nor, above all, created through history. . . . History can then no longer be presented as an object of worship."  Albert Camus, The Rebel: An Essay on Man in Revolt 302 (Anthony Bower trans., Vintage Books 1956) (1951).

the *Casey* joint opinion's "verbal shell game . . . conceal[s] raw judicial policy choices concerning what is 'appropriate' abortion legislation," *id.* at 987 (Scalia, J., concurring in the judgment in part and dissenting in part).  At bottom, because *Casey*'s "undue burden" is a standard-less standard, a "concept [that] has no principled or coherent legal basis," courts are left to their own devices. *Id.*  Yet even under *Casey*, our judicial discretion is not totally unfettered. Here, the text of the Due Process Clause and the fundamental constitutional right to travel demonstrate that courts must not stop the undue burden analysis at state borders, without considering access to abortion services in neighboring states.  But the fact that the majority disagrees, fabricates new rules from *Casey*'s silence, and overextends *Gaines*—an equal protection case— evinces *Casey*'s ultimate failure to explain when a burden is "undue."  In the end, under *Casey*, the majority's maneuvers are not legal, but political.

Worse still, *Casey* allows judicial policy choices to be cloaked in the specific facts of any given case.  The *Casey* decision, by limiting its assessment of the Pennsylvania abortion statute to the "evidence on th[e] record" without explaining the legal significance of particular facts, *id.* at 884, rendered itself wholly *sui generis*, bound to that record and incapable of establishing any "generally applicable principle," *id.* at 988 (Scalia, J., concurring in the judgment in part and dissenting in part).[24]  Like the *Casey* joint opinion, the

---

[24] *See also Casey*, 505 U.S. at 887 ("[O]n *the record before us*, and in the context of this facial challenge, we are not convinced that the 24–hour waiting period constitutes an undue burden." (emphasis added)); *id.* at 901 ("While at some point increased cost [resulting from recordkeeping and reporting requirements of the challenged statute] could become a substantial obstacle, there is no such showing *on the record before us*." (emphasis added)); *id.* at 991–92 ("[T]he approach of the joint opinion is, for the most part, simply to highlight certain facts in the record that apparently strike the three Justices as particularly significant in establishing (or refuting) the existence of an undue burden; after describing these facts, the opinion then simply announces that the provision either does or does not impose a 'substantial obstacle' or an 'undue burden.'  We do not know whether the same conclusions could have been reached on a different record, or in what respects the record would have had

majority here claims that its holding depends on a meandering list of factors "including, but not limited to," certain facts present in this case. *Ante* at 17. In this way, the majority purports to hold that while the closure of all abortion providers in a state is not necessarily unconstitutional, the burden created by H.B. 1390 in Mississippi simply happens to be "undue." *Id.* *Casey*'s logic is perverse indeed: Courts can make policy decisions about which abortion restrictions are "undue," and then escape any jurisprudential ramifications of those decisions by taking refuge in the purportedly distinct factual context of that particular application.

By its jarring opinion, the majority has affirmed the district court's decision to enjoin enforcement of H.B. 1390, enacted by the Mississippi legislature—the people's elected representatives—to regulate physicians' services. That this injunction flows from the policy choices of judges, who must fill the vacuum that is now the Due Process Clause's "liberty" interest, is a profoundly troubling consequence of current constitutional jurisprudence under *Casey*.[25]

---

to differ before an opposite conclusion would have been appropriate." (citations omitted)) (Scalia, J., concurring in the judgment in part and dissenting in part).

[25] Professor Hamburger has commented on this aggrandizement of judicial power:

> [M]any Americans, in their desire to prevent the people from abusing the power above law, have invited their judges to exercise it. . . . [N]ot unlike some kings and Parliament when they claimed to be the final arbiter, American judges have acquired a taste for power above the law. Perhaps every society needs this sort of power, but in denying absolute power to Parliament, Americans did not give it to the judges, and although it is questionable whether the people, being merely human, will always act wisely and justly in exercising their power above the law of the land, it is even more doubtful whether the judges or any other persons in government can be trusted with such a power. Men will ever be discontent with law and ambitious for power, and judges will ever be vain enough to aspire to a justice above human law, but it is therefore all the more important for judges to recall the common law ideals of law and judicial duty.

No. 13-60599

\*      \*      \*

"[T]he boundaries of substantive due process are less than pellucid," and even the Supreme Court has "had difficulty in fixing [the] outer perimeter" of these rights. *Causeway Med. Suite v. Ieyoub*, 109 F.3d 1096, 1115 (5th Cir. 1997) (Garza, J., specially concurring). We here confront the quandary of "boundaries" and "perimeters" in a starkly literal sense—under *Casey*, how far is too far to travel to an abortion clinic?

Ultimately, I await a return to legal theory that recognizes principled limits.[26] Even the majority accepts that the "controversy [over the scope of the abortion right] seems to have no end . . . ." *Ante* at 8. But in the absence of meaningful guidance from *Casey* and its progeny, the solution cannot be what the majority has proffered. Here, JWHO has not shown that the Clinic's closure would be the direct effect of H.B. 1390, given the independent decisions of the local hospitals. And even if causation were established, because merely crossing a state line would not constitute an undue burden, closure of the only abortion provider in Mississippi would not necessarily be unconstitutional; the district court failed to make findings about abortion access in neighboring states. Accordingly, because JWHO has not demonstrated a substantial likelihood of success on the merits, I would vacate the preliminary injunction.

Respectfully, I dissent.

---

Philip Hamburger, Law and Judicial Duty 620–21 (2008), *accord* Emilio M. Garza, *Judicial Duty and the Future: Two Issues of Fundamental Law*, 6 J. L. Phil. & Culture 147, 156 (2011).

[26] Government must be guided by "thought that recognizes limits." Camus, *supra* note 23, at 294. Moreover, when a representative government subverts the Constitution, it runs the risk of being superseded by a new (and potentially less representative) government. *See* Eric Voegelin, The New Science of Politics 49 (1952). The Supreme Court has subjected substantive due process theory only to the "[a]ppropriate limits" of "respect for the teachings of history" and "solid recognition of the basic values that underlie our society," which in practice are not limits at all. *Moore v. City of E. Cleveland*, 431 U.S. 494, 503 (1977) (Powell, J.) (citation omitted).